James **LUNDGREN**, dba Pacific Construction Company, Appellant,

v.

Claude **FREEMAN**, Sydney B. Hayslip and Stewart Tuft, Co-partners, dba Freeman, Hayslip and Tuft, Appellees.

**SCHOOL DISTRICT NO. 5**, Appellant,

v.

James **LUNDGREN**, dba Pacific Construction Company, Appellee.

No. 17232.

United States Court of Appeals Ninth Circuit.

June 27, 1962.

See also 292 F.2d 489.

Reinhardt, Coblens & Stoll and Justin N. Reinhardt, Portland, Or., for appellant Lundgren.

Banta, Silven, Horton & Young and David C. Silven, Baker, Or., for appellant School Dist. No. 5.

Koerner, Young, McColloch & Dezendorf, Oglesby H. Young, and James H. Clarke, Portland, Or., for appellees.

Before JERTBERG, KOELSCH and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Lundgren, a building contractor, appeals from an order and a summary judgment, and School District No. 5 of Baker, Oregon, ("school district") appeals from two judgments, in an action brought by Lundgren against school district and the architectural firm of Freeman, Hayslip and Tuft ("architects"). We are affirming as to all matters appealed, except the time as of which interest is allowed, and the summary judgment in favor of architects. As to these, we are reversing.

On August 7 and September 29, 1950, Lundgren entered into written contracts with school district to construct a high school and shop and a swimming pool and bathhouse. On June 27, 1952, a month after Lundgren had notified architects that the high school and shop were about ready for final acceptance, school district notified Lundgren that it was terminating his employment because of total breach. This was done on the advice of architects, who claim to have acted pursuant to Article 19 of the General Conditions of both contracts between Lundgren and school district.[1]

---

1. Article 19 provides:
   "If the Contractor should persistently or repeatedly refuse or should fail, except in cases for which extension of time is provided, to supply enough properly skilled workmen or proper material, or if he should fail to make prompt payment to subcontractors or for material or labor, or persistently disregard the instruction of the Architect, or otherwise be guilty of a substantial violation of any provisions of the contract, then the Owner, upon the certificate of the Architect that sufficient cause exists to justify such action, may terminate the employment of the Contractor and take possession of the premises and all materials, tools and appliances thereon and finish the work by whatever methods he may deem expedient. In such case the Contractor shall not be entitled to receive any further payments until the work is finished."

School district refused to pay Lundgren the amount claimed by him to be due on the contract, $55,834.01. It also refused to pay the amount claimed due on the swimming pool and bathhouse contract, $9,776.35, although a certificate of final acceptance had been issued for this contract. Lundgren sued school district for the unpaid balances ($65,610.36), for losses due to defects in plans and specifications and having to do work uncalled for by the contracts and to redo work done strictly in accordance with the contracts ($100,000), and for loss of his "normal builder's fee" ($67,000). He joined a claim against architects for wilfully and maliciously interfering with his performance of the contracts and inducing school district to breach and claimed the same damages against them as he did against school district, together with damage to reputation because of architects' claim that he had failed to substantially perform his contracts, damage to credit standing with subcontractors, materialmen and bonding companies because of architects' failure to make prompt payments ($150,000), and for punitive damages ($50,000). School district had two counterclaims, one for damages for faulty construction on both projects ($250,000), and the other for miscellaneous heating and electricity costs. School district set off $16,626.35, the cost of completing the high school after Lundgren's employment was terminated. The district court had jurisdiction under 28 U.S.C. § 1332.

Lundgren's claim against school district was submitted to arbitration by stipulation on April 3, 1953, as agreed to in Article 29 [2] of the General Conditions of both the high school and swimming pool contracts. The stipulation provided that "the issues between [the] parties * * * will be arbitrated in accordance with the Federal Arbitration Statute * * *." On December 8, 1953 the arbitrators awarded $58,039.81 to Lundgren. The award included the unpaid balances, plus losses due to defects in plans and specifications and having unnecessarily to do and redo work, less the cost to school district for satisfactory completion. It also included "extras" not agreed to by customary written change orders. The arbitrators allowed school district the cost of heating and electricity, but denied its counterclaim for faulty construction. In their award, the arbitrators made the following statement:

"2. The following matters regarding which the parties made contentions and offered evidence before this board have not been determined by this board because their determination depends upon questions of law which this board does not feel competent to decide and which should be adjudicated by the United States District Court for the District of Oregon independently of this award, namely:

"(a) Whether in addition to the amounts awarded him herein, the plaintiff is entitled to recover the amount for the sound system and the lockers.

"(b) Whether the defendant School District No. 5 breached its contracts with the plaintiff by terminating them on or about July 8, 1952, and, if so, whether it is liable to the plaintiff for damages resulting therefrom, and, if so, in what amount.

"3. All of the claims of either party against the other were submitted to and determined by this board as shown in its final decisions, and except to the extent indicated therein and in paragraph * * *

---

2. Article 29 provides:
"All disputes, claims or questions subject to arbitration under this contract shall be submitted to arbitration * * * and this agreement shall be specifically enforceable under the prevailing arbitration laws, and judgment upon the award rendered may be entered in the highest court of the forum, state or federal, having jurisdiction. It is mutually agreed that the decision of the arbitrators shall be a condition precedent to any right of legal action that either party may have against the others."

2 of this award, each and every contention and claim of either party against the other has been and is hereby denied."

The district court, acting under 9 U. S.C. § 9 (the Federal Arbitration Act) confirmed the award on June 17, 1954 and revised it on March 21, 1957. It allowed Lundgren interest on the award at 6% per annum as of June 26, 1952, the date when school district terminated Lundgren's employment. On April 22, 1957, the court reformed the high school contract so as to give Lundgren an additional amount for installing a sound system and lockers, again allowing interest as of June 26, 1952.[3] On December 15, 1958, the district court ordered that in spite of the reservation of the issue of breach by the arbitrators, no issue remained between Lundgren and school district.

Lundgren's suit against architects was never submitted to arbitration. On November 7, 1960, the district court entered a summary judgment for the architects (F.R.Civ.P. Rule 56, 28 U.S.C.).[4] School district appeals from the judgments of June 17, 1954 (as revised on March 21, 1957) and April 22, 1957, and Lundgren appeals from the order of December 15, 1958, and the summary judgment of November 7, 1960 in favor of architects.[5]

A. *The appeal of School District*

1. *The claim that "points of law" were reserved.*

██ School district contends that the trial court erroneously confirmed the arbitrators' allowance to Lundgren of "extras" and losses caused by defects in the plans and specifications. It says that when the parties stipulated to arbitration they meant to reserve "points of law" to the court and that, as shown by exchanges between arbitrators and counsel in the arbitration proceedings, the arbitrators, in fact, intended to reserve all "points of law", in spite of a contrary recitation in their award, and that both the matter of "extras" and the matter of errors in the plans and specifications present "points of law". The record does not support these contentions.

██ The arbitrators in their award specifically said that they had considered "contentions of fact and of law". The Federal Arbitration Act provides only four grounds on which a court may vacate an arbitration award (see 9 U.S.C. § 10), the one relevant here being that the arbitrators exceeded their powers. This must be clearly shown. (E. g., see Textile Workers Union of America v. American Thread Co., 4 Cir., 1961, 291 F.2d 894.) By considering "contentions of law" the arbitrators were not exceeding their powers. The scope of the ar-

---

3. School district's appeal to this court from both orders was dismissed as premature (School District No. 5 v. Lundgren, 1958, 259 F.2d 101).

4. It held, as to all claims except that for punitive damages:

   "2. When plaintiff proceeded with the arbitration, he elected to proceed under the terms of Article 29 of the General Conditions of the Contract signed by him. By so arbitrating plaintiff voluntarily elected his remedy, secured a judgment and has now been fully compensated on his theory of restitution. Because of this voluntary election of remedies by the plaintiff, he cannot now recover a second time on a different theory of liability for the same alleged wrong."

   As to punitive damages, the district court held:

"3. The only issue raised by the complaint which has not been finally determined by the arbitrators and the Court is whether the individual defendants are liable for punitive damages by reason of their alleged intentional interference with the business of plaintiff. In this regard plaintiff has no claim against the individual defendants because it is undisputed that in all of their actions in connection with the performance under the contract that the individual defendants were acting as architects for the construction work done and as such were either quasi-arbitrators or agents of the school district. As quasi-arbitrators the individual defendants are immune from legal action by plaintiff to interfere with said contracts and were privileged to do so."

5. All the appeals are timely. (Lundgren v. Freeman et al., No. 17,232).

bitrators' power rests ultimately on the agreement of the parties (e. g., Metro Industrial Painting Corp. v. Terminal Const. Co., 2 Cir., 1961, 287 F.2d 382; Local 205, United Electrical Radio and Machine Workers of America v. General Electric Co., 1 Cir., 1956, 233 F.2d 85, affd. 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed. 2d 1028). The policy of the Arbitration Act is that the agreement be liberally construed in favor of arbitration. (E. g., Metro Industrial Painting Corp. v. Terminal Const. Co., supra, 2 Cir., 1961, 287 F.2d 382; see Local 201, International Union of Electrical, Radio and Machine Workers v. General Electric Co., 1 Cir., 1959, 262 F.2d 265).

The original arbitration agreement is broadly framed; it provides that "all disputes, claims or questions subject to arbitration under this contract shall be submitted * * * ". Shortly after the stipulation to arbitrate, Lundgren's attorney on April 27, 1953 wrote the school district's attorney asking for confirmation of Lundgren's understanding that "the award made by the arbitrators * * * shall constitute the award upon which the court in pending litigation shall enter judgment; said award being subject to attack or review only as provided in the federal arbitration statute * * * ". There was no reply. In the arbitration hearings themselves there is evidence that counsel for both sides may have assumed that "points of law" would be reserved to the court, but there is no evidence that the parties actually agreed to modification of the arbitration agreement in the sense that both intentionally

agreed to change the agreement so that "points of law" were not to be arbitrated (see, e. g., American Locomotive Co. v. Chemical Research Corp., 6 Cir., 1948, 171 F.2d 115; 9 U.S.C. § 2).[6]

■ The scope of review given the courts in overseeing arbitration proceedings under the Federal Arbitration Act is limited. It does not include reviewing questions of law. Section 9 of the Act provides only that the court shall enter judgment on the award, Section 10, that the court may vacate the award for fraud in procurement, corruption, misconduct or exceeding of powers, and Section 11, that the court may correct the award for material miscalculations, exceeding of powers, and imperfection in form. (9 U.S.C. §§ 9, 10, 11).

## 2. *The allowance of interest.*

■ School district also contends that the court erred in allowing interest as of June 26, 1952, in the judgments of June 17, 1954 and April 22, 1957. We do not accept school district's contention that it is altogether immune, as an arm of the sovereign, from claims for interest. School district's liability is a "general" one for it is based on Oregon Revised Statute § 30.320.[7] Recent cases indicate that the general interest statute applies if a state agency is liable under ORS § 30.320. (Eldon v. Chandler, 1954, 202 Or. 407, 275 P.2d 748; North Pacific Construction Co. v. Wallowa County, 1926, 119 Or. 565, 249 P. 1100; but see Monteith v. Parker, 1899, 36 Or. 170, 59 P. 192).[8]

6. Perhaps the arbitrators *could* have reserved points of law, for when the scope of arbitration is stated broadly, as in the agreement in the principal case, the arbitrators may have an implied authority to determine what issues are arbitrable. (See Local 205, United Electrical, Radio and Machine Workers of America v. General Electric Co., supra, 1 Cir., 1956, 233 F.2d 85; Local 201, International Union of Electrical, Radio and Machine Workers v. General Electric Co., supra, 1 Cir., 1959, 262 F.2d 265). Here, although the arbitrators may have been acting pursuant to such an implied au-

thority in expressly reserving two "questions of law" for the court, their award shows they did not reserve all "questions of law".

7. "A suit or action may be maintained against any county and against the State of Oregon by and through and in the name of the appropriate state agency upon a contract made by the county in its corporate character, or made by such agency and within the scope of its authority, and not otherwise * * *."

8. The peculiar Oregon rule as to a "special" liability does not apply here. The

The court did err in awarding interest as of June 26, 1952, the date school district allegedly breached its contract.[9] Under ORS § 82.010(1) (a), money is "due" when there is a wrongful withholding of money, the amount being either ascertained, or ascertainable by simple computation or reference to recognized standards. (E. g., Public Market Co. of Portland v. City of Portland, 1943, 171 Or. 522, 130 P.2d 624, 138 P.2d 916; Northern Pacific R. Co. v. Twohy Bros. Co., 9 Cir., 1938, 95 F.2d 220; Northern Pacific Construction Co. v. Wallowa County, 1926, 119 Or. 565, 249 P. 1100). The theory is that the party in breach should compensate the injured party for wrongfully withholding from him the use of an easily ascertainable sum of money after the due date. (Public Market Co. of Portland, supra, 1943, 171 Or. 522, 130 P.2d 624, 138 P.2d 916, 918–919; Northern Pacific R. Co. v. Twohy Bros. Co., 9 Cir., 1938, 95 F.2d 220, 226).

Here, there has been no finding that school district withheld payment in breach of contract on June 26, 1952. Article 19 of the General Conditions (note 1, supra) allowed school district to withhold further payments, until the job was satisfactorily completed, in the event the contractor's employment was terminated for total breach. There is no determination in the arbitrators' award that Lundgren was not in such breach or that school district's refusal to make final payment on June 26, 1952 was not in accordance with Article 19. The arbitrators did deny school district's counterclaim for damages for improper construction, but they allowed it to recover for the cost of completion and for certain other matters. And they expressly reserved for court determination the question whether school district breached its contracts with Lundgren by terminating. Nor did the court make a finding that there was such a breach.[10] The most that can be said is that there were some breaches on both sides, but that Lundgren's were not so susbtantial as to deny him recovery.

Moreover, and more important, it does not appear that the amount due was either ascertained or ascertainable by simple computation by reference to recognized standards. Cross demands and claims by Lundgren and school district, as to many disputed items, were sub-

Oregon rule is, that where a statute creates a special liability of a state agency, acting in its governmental capacity, the general interest statute (ORS § 82.010) is inapplicable. Seton v. Hoyt, 1899, 34 Or. 266, 55 P. 967, 43 L.R.A. 634 (statute on payment of county warrants); Northwestern Ice & Cold Storage Co. v. Multnomah County, 1961, 228 Or. 507, 365 P.2d 876 (compensation for unfair condemnation). And since interest may never be awarded against the sovereign on principles of equity (see Seton v. Hoyt, supra, 1899, 34 Or. 266, 55 P. 967), special legislation allowing interest is necessary.

9. The general interest statute provides (Oregon Revised Statutes 82.010):
"(1) the legal rate of interest is six percent per annum and is payable on:
"(a) All moneys after they become due; but open accounts bear interest from the date of the last item thereof. * * *
       *     *     *     *     *
"(d) Money due upon the settlement of matured accounts from the day the balance is ascertained."

10. Further, even if school district did wrongfully terminate Lundgren's employment on June 26, Article 20 of the General Conditions provides that final payment is not due until 35 days after the final acceptance by the architects. Nothing in the award suggests that architects wrongfully refused to issue a certificate of final acceptance on or before June 26, 1952. The court, during exchanges with the attorneys in a pretrial conference in December, 1958, remarked that it thought there had been a breach by the school district, but this hardly amounts to a holding and was long after the judgments awarding interest had been entered. Moreover, we do not think that a reviewing court in affirming an award, is entitled to determine that there has been a wrongful withholding as of a certain date and award interest from that date, where the arbitrators have made no such determination. As we will show, it makes no difference that the arbitrators purported to reserve the determination of whether there was a breach to the court.

mitted to the arbitrators. Many were allowed; many more were not. It cannot fairly be said that the net amount due Lundgren was ascertained or ascertainable until the arbitrators made their award.

■ The Oregon general interest statute provides not only that interest is payable on moneys after they become "due" (ORS § 82.010(1)(a)), and on money due upon the settlement of matured accounts "from the day the balance is ascertained" (ORS § 82.010(1) (d)), but also provides that interest on judgment and decrees for the payment of money shall be from the date of their entry. Oregon Revised Statutes, § 82.-010(1) (b). The last is true even if there is a subsequent appeal—if the judgment is affirmed. But if the judgment is modified on appeal, interest runs as of the date of the modification. (Compton v. Hammond Lumber Co., 1936, 154 Or. 650, 61 P.2d 1257). The policy behind these provisions seems to be that once a balance due has been ascertained, interest should run from this date, and that one party's having the right to have the correctness of the determination further litigated, as by motion for new trial or appeal, should have no effect if such further litigation be unsuccessful.

■ ■ We think that, in the application of this policy, the Oregon courts would hold that interest runs from the date of the award. The parties selected arbitrators, rather than a court, as the body that would, in the first instance, determine the amount due. This they had a right to do; this the law encourages them to do. It should be the rule, rather than the exception, that when arbitrators hand down an award the parties will comply with it, without the necessity of court proceedings, just as it is (or should be) the normal or usual result that parties comply with a judgment, without the necessity of resort to process or appeal. In the case of judgments, with the exception above noted, the date of judgment is the latest date when interest begins, although appeal is available. Likewise, in the case of arbitra-

tion awards, the date of the award, unless the award be modified by the court, should be the latest date when interest begins. (See 47 C.J.S. Interest § 20). We hold that the moneys under the arbitration award were not due, under ORS § 82.010(1) (a), or the balance ascertained, under § 82.010(1) (d), until the date of the award, December 8, 1953. As to the sound system and lockers, interest should run from the date of the reformation, April 22, 1957.

3. *The question of reformation.*

School district's last point is that the court erroneously decreed reformation of the high school contract so as to give Lundgren a sum, in addition to the basic bid price, for the sound system and lockers.

Article 3 of the high school contract reads:

"The Owner shall pay the Contractor for the performance of this Contract, subject to additions and deductions as provided herein, in current funds as follows:

"The basic sum of nine hundred seventy five thousand, one hundred ($975,100.00) which is computed as follows: Basic bid price of $994,-500.00 less Alternate No. 1 at $6,-800.00 and Alternate No. 2 at $12,-600.00 (Total deducted by Alternates $19,400.00). Basic sum includes unit price of $3,800.00 for sound system and all corridor lockers at $14.95 installed."

The court found that the parties mutually intended that the basic sum did not include the price for sound system and corridor lockers, and mistakenly recited the contrary. This finding was based on Lundgren's original bid (which was not adopted) in which he specified that the unit price for sound system and lockers was not included, on the minutes of a meeting of school district held just before execution of the high school contract, which indicated that Lundgren's bid, even as amended, still did not include sound systems and lockers, and on the manner in which the contract

was drawn, including the method of arriving at a reduced price, contemplated by the bid and accomplished by accepting two alternatives in the bid and making two change orders. Further, the architects, not the parties, drew up the written agreement.

The Oregon rule is that a court may decree reformation of a written contract because of mutual mistake only if the evidence of mistake is "full, clear, cogent, and decisive". (E. g., L. B. Menefee Lumber Co. v. Gamble, 1926, 119 Or. 224, 234, 242 P. 628, 631; Moyer v. Ramseyer, 1961, 226 Or. 122, 359 P.2d 407); reformation may not be based on a mere preponderance of the evidence. (Kontz v. B. P. John Furniture Corp., 1941, 167 Or. 187, 205, 115 P.2d 319, 326). There was some evidence that there was, in fact, no mutual mistake, but we are satisfied that the trial court's finding is supported by the evidence, viewed as a whole, and was not "clearly erroneous". We are bound by Rule 52(a) F.R. Civ.P., which provides that: "findings of fact shall not be set aside unless clearly erroneous * * *." Therefore, we may not substitute our judgment if conflicting inferences may be drawn from the established facts by reasonable men, and the inferences drawn by the trial court are those which could have been drawn by reasonable men.

There seems to be considerable confusion as to whether Rule 52(a) allows an appellate court to disregard a trial court's findings where fact issues are decided on written evidence alone, so that the appellate court is as able to determine credibility as the trial court. Rule 52(a) provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Where the credibility of witnesses is not involved, many courts have given only slight weight to the trial court's findings of fact. (See 5 Moore's Federal Practice 2637, fn. 2). This view is expressed by Judge Frank in Orvis v. Higgins, 2d Cir., 1950, 180 F.2d 537: "[i]f [the trial judge] decides a fact issue on written evidence alone, we are as able as he to determine credibility, and so we may disregard his finding." (Id. at 539) Thus, under this view, direct observation of witnesses is the controlling criterion as to whether the trial court findings should be given weight. Professor Moore supports the Frank position stating "(Frank's) theory is a natural and proper concomitant of appellate power. It probably will and should commend itself to other circuits." (5 Moore at 2642) Other courts, however, hold that the "clearly erroneous" test does mean something, even where the trial was on written instruments and depositions. (E. g., Widney v. U. S., 10 Cir., 1949, 178 F.2d 880; see Friedman v. Sealy, Inc., 10 Cir., 1959, 274 F.2d 255 (there was conflicting oral testimony, however); Snorgrass v. Sears, Roebuck & Co., 7 Cir., 1960, 275 F.2d 691; cf. Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 and see 9th Circuit cases, *infra*). This seems to be the view of Judge Clark, who drafted Rule 52(a). (See 5 Moore at 2642, fn. 22).

It seems to us that the Clark view is favored by history. Rule 52(a) incorporates the type of review that previously was had in equity cases. (See United States v. U. S. Gypsum Co., 1948, 333 U.S. 364, 394–95, 68 S.Ct. 525, 92 L.Ed. 746; 5 Moore's Federal Practice (2d ed.), 2609–29). Historically, review of jury verdicts was by writ of error, and appellate courts, in general, could only reverse if the jury was improperly instructed as to the law or obviously misapplied the law. The Seventh Amendment precluded appellate review of issues of fact. In equity (and maritime) cases, review was had by "appeal"; the appellate court could review determinations of fact, and the evidence was sent to the appellate court to enable it to do so. (2 Stat. 244, March 3, 1803). The reasons for this kind of review seem to have been: (1) It was especially dif-

ficult in equity and admiralty cases to separate questions of law and questions of fact. (2) In many cases, the only questions were of fact, and it was found necessary that decisions in admiralty cases, "of moment to our domestic tranquility and foreign relations", have the authority of a decision of a high court. Further, in equity cases, lack of review of findings of fact left "the property of the country too much to the discretion and judgment of a single judge". (3) It was better for the appellate court to have the evidence, rather than mere findings of fact, because trial judges tended to fashion "findings of fact" to support their result. (See Blume, Review of Facts in Non-Jury Cases, 1936, 20 Am.Judic.Society, 68, 69–70). The purpose of "appeal" in equity cases was to enable a higher court to search the record to see if justice was done (id. at 70). Such a search often had the appearance of a trial de novo, where the trial court did not have the credibility advantage. See Paraffine Companies v. McEverlast, 9 Cir., 1936, 84 F.2d 335, 339; Rown v. Brake Testing Equipment Corporation, 9 Cir., 1930, 38 F.2d 220; United States v. Booth-Kelly Lumber Co., 9 Cir., 1913, 203 F. 423, 429, aff'd 237 U.S. 481, 35 S.Ct. 659, 59 L.Ed. 1058.

■ One of the purposes of Rule 52 (a) was to give the same scope of review in law cases tried without a jury, as in equity cases. In 1865, Congress enacted a statute allowing waiver of trial by jury in all civil cases. (28 U.S.C. §§ 773, 875). But review, as in jury cases, could be had only by "writ of error". Review of the trier of fact's application of the law was restricted by the absence of "instructions" to the trier of fact. Moreover, to insure justice was done in jury cases, although there was nothing to show application of the law was incorrect, the trial judge could grant a new trial. It was perhaps less likely the trial judge, himself the trier of fact, would do this in cases tried without a jury. (See Blume, supra, at 70) Therefore, Rule 52(a) seems to have been de-

signed to enable the *appellate* court to review the trial judge's findings of fact to see that justice has been done. (Ibid.)

Nothing in the history of review of equity cases or of law cases tried without a jury suggests that the appellate court ever decides issues of fact in the first instance, even where it considers itself as fully qualified as the trial judge to do so. Rule 52(a) should be construed to encourage appeals that are based on a conviction that the trial court's decision has been unjust; it should not be construed to encourage appeals that are based on the hope that the appellate court will second-guess the trial court. (See Blume, at 72) Rule 52(a) explicitly clearly applies where the trial court has not had an opportunity to judge of the credibility of witnesses.

■ Further, one of the purposes of findings of fact is to give the appellate court a clear understanding of the basis of the trial court's decision. (E. g., Irish v. United States, 9 Cir., 1955, 225 F.2d 3). There would be no real purpose for such a finding in the principal case, if the appellate court could hold a trial de novo.

There are Ninth Circuit cases on both sides of the question, but the recent cases seem to espouse the *Clark,* as opposed to the *Frank* view. Cases supporting the *Clark* view are: Randall Foundation, Inc. v. Riddell, 1957, 244 F.2d 803; Azevedo v. Commissioner, 1957, 246 F. 2d 196; see Wilbur Security Co. v. Commissioner, 1960, 279 F.2d 657; Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 289–91, 80 S.Ct. 1190, 4 L.Ed.2d 1218; Travelers Ins. Co. v. Peerless Ins. Co., 1961, 287 F.2d 742. Cases supporting the *Frank* view are: Furness, Withy & Co. v. Carter, 1960, 281 F.2d 264, 266; Johnson v. Griffiths S. S. Co., 1945, 150 F.2d 224; Smyth v. Barneson, 1950, 181 F.2d 143; Kaufman-Brown Potato Co. v. Long, 1950, 182 F.2d 594; Besig v. U. S., 1953, 208 F.2d 142, 144; U. S. v. Adamant Co., 1952, 197 F.2d 1, 6; National Lead Co. v. Wolfe, 1955, 223 F.2d 195, 204; One Incorporated v. Olesen,

1957, 241 F.2d 772; Pacific Vegetable Oil Corp. v. Commissioner, 1957, 251 F.2d 682, 683; American Eagle Fire Ins. Co. v. Eagle Star Ins., 1954, 216 F.2d 176, 179; but see Faulkner v. Gibbs, 1952, 199 F.2d 635 and Greene-Haldeman v. Commr., 1960, 282 F.2d 884, 888, which question the *Frank* view without expressly disapproving it.

A recent Supreme Court case, Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218, strongly suggests that the *Clark* view as to review of findings based on undisputed facts, is the correct one. The Supreme Court found that the question of whether there has been a gift, for income tax purposes, is a question of fact, and not a question of law; and the "clearly erroneous" test applies even though it seems the basic facts are undisputed (id. at 289–291, 80 S.Ct. 1190). A finding of fact, to which the clearly erroneous rule applies, is a finding based on the "fact-finding tribunal's experience with the mainsprings of human conduct". A conclusion of law would be a conclusion based on application of a legal standard. Many Ninth Circuit cases espousing the *Frank* view are explainable as applying the rule that courts of appeal need give no weight to a trial court's conclusions of law. Stevenot v. Norberg, 1954, 210 F.2d 615; see Kwikset Locks, Inc. v. Hillgren, 1954, 210 F.2d 483; Brown v. Cowden Livestock Co., 1951, 187 F.2d 1015, 1018; Plomb Tool Co. v. Sanger, 1951, 193 F.2d 260; Kemart Corp. v. Printing Arts Research Laboratories, 1953, 201 F.2d 624; Besig v. U. S., 1953, 208 F.2d 142, 144; National Lead Co. v. Wolfe, 1955, 223 F.2d 195, 204; One Incorporated v. Olesen, 1957, 241 F.2d 772, 774; Pacific Vegetable Oil Corp. v. Commissioner, 1957, 251 F.2d 682, 683; Furness Withy & Co. v. Carter, 1960, 281 F.2d 264, 266; Hycon Mfg. Co. v. H. Hoch & Sons, 1955, 219 F.2d 353. In all these cases the inferences drawn from the undisputed facts seem to have been inferences derived from application of a legal standard and not inferences de-

rived from having had "experience with the mainsprings of human conduct."

In the principal case the finding of mutual mistake can be fairly said to be derived not solely from application of legal standards, but from the trial judge's experience with human affairs.

**B.** *The appeals of Lundgren*

**1.** *The claim that additional issues remain between Lundgren and school district.*

As for Lundgren's appeal from the order of December 15, 1958, decreeing that no further issue remained between him and school district, we agree that the arbitration award bars further proceedings. Because it depended upon "questions of law which [the] board [did] not feel competent to decide", the arbitrators purported to reserve for the district court, to adjudicate independently of the award, the question: "[w]hether the defendant School District No. 5 breached its contracts with the plaintiff by terminating them on or about July 8, 1952, and if so, whether it is liable to the plaintiff for damages resulting therefrom, and if so, in what amount". Lundgren claims that he sustained special damages such as loss of reputation and loss of credit standing, and that he could not have recovered them in the arbitration proceedings because of the above express reservation.

The short answer to this contention is that Lundgren never claimed such damages in his complaint against school district. The stipulation was to arbitrate "the issues between the parties". He claimed "an out-of-pocket loss in the performance of said contracts in a sum in excess of $100,000.00 in addition to losing his normal builder's fee of $67,000.00". He also alleged nonpayment of the unpaid balances of the contract prices. His "builder's fee" is obviously included in the contract prices. The arbitrators' award, plus the court's judgment of reformation, gave him those prices, less certain offsets to school district. He also submitted his claims for extra costs to the arbitrators, who al-

lowed some and disallowed others. The court's decision is correct.

### 2. *The claim against architects.*

In his complaint, Lundgren pleaded a separate cause of action against architects, in which he charged that they "wrongfully and wilfully induced" a breach of the two contracts by school district, and that they "were motivated by a malicious and willful [sic] desire and intent to injure" him. He asked for the same damages as were asked from school district, and, in addition, for $150,000 damage to him "in his reputation as a building contractor and in his credit standing in the building industry", together with $50,000 punitive damages. In a pre-trial order relating to this question, Lundgren's claims are stated to be, among others, that breach by school district "was induced by * * * architects without justification", that they "intentionally interfered" with his business, and in so doing, "were motivated by a wilful and malicious desire to injure" him. He also claimed to be entitled to recover for their negligence.

Architects then moved for a summary judgment. Their grounds were two: (1) that Lundgren had elected his remedy by going to arbitration with school district, and (2) that it is undisputed that in all their actions, the architects were acting either as agents or as quasi-arbitrators under the two contracts, and are therefore immune, since they were expressly authorized by Lundgren to in-terfere with the contracts, and were privileged to do so. No affidavits were filed in support of the motion, reliance being upon the pleadings, judgments and orders in the case, answers to interrogatories, Lundgren's deposition, the arbitrators' decision and award, the record on appeal and the contracts. The motion was granted, "in accordance with their [architects'] theory". (See footnote 4, supra.)

Upon the record before us, it is clear that architects were acting in one of three capacities, either (1) as agents of school district, (2) as quasi-arbitrators, or (3) on their own, in the sense that they were not acting as agents or as quasi-arbitrators.

Their actions as agents for school district are provided for in a contract between them and school district,[11] as well as in the latter's contracts with Lundgren.[12] These contracts also provide for architects' duties as quasi-arbitrators.[12]

■ As agents, architects are not here liable for decisions made by them, acting within their powers as agents, because Lundgren has elected his remedy. It is generally held that a plaintiff who has had the existence or extent of a wrong litigated in an action against the principal may not thereafter have the same matters litigated as to the agent. (See 31 A.L.R. 194–97; 30A American Jurisprudence, Judgments, §§ 429–30). The better rule seems to be that a plain-

---

11. "The architects agree to perform all professional services * * * for the construction, erecting, equipping and furnishing of buildings and grounds on any or all projects in said building and development program **as and when authorized by the Owner** and to furnish architectural supervision therefor; * * * [T]he parties hereto agree to the following conditions:

"1. **The Architects' Services.** The Architects' professional service shall consist of the necessary conferences, the preparation of preliminary sketches, working drawings, specifications, large scale and full size detail drawings; the drafting of forms of proposals and contracts; the issuance of certificates of payment; the keeping of accounts, the general administration of the business, and the supervision of the work. * * *

* * * * *

"5. **Supervision of the Work.** The Architects will endeavor to guard the Owner against defects and deficiencies in the work of the contractors and workmen, but they do not guarantee the performance of the Contracts. * * *

"When authorized by the Owner a Clerk-of-the-works or Superintendent shall be appointed by the Architects with the approval of the Owner. He shall be subject to the instruction and supervision of the Architects * * *."

12. See Note 12 on page 117.

tiff who has recovered against a principal may sue the agent for the balance of an unsatisfied judgment against the principal. (30A Am.Jur., "Judgments", § 430; see 1 Freeman on Judgments, 1034–35 (5th ed., 1925); see McNamara v. Chapman, 1923, 81 N.H. 169, 123 A. 229, 31 A.L.R. 188, 193). This, however, is not such an action. A widely held view is that by suing the principal, the plaintiff has elected to rely on the principal's financial resources, evidently on the reasoning that the agent should not be sued twice,—once by the principal for the amount of the judgment the principal has paid, and again by the plaintiff. (See 1 Freeman on Judgments, 1034–35 (5th ed., 1925). The Oregon courts do not seem to have passed on the subject. We think that, in this particular case, Lundgren made an election on the contracts. They expressly provide that architects' decisions are subject to arbitration,[12] and the arbitration is between Lundgren and school district. (Footnote 2, supra.) It is clearly contemplated that architects may make erroneous decisions, and a means of rectifying them is provided. We see no reason for adding another remedy against architects, at least where the judgment against school district is not uncollectible. This rule, we think, applies whether architects' actions were intentional, negligent or merely erroneous.

What we have said applies equally to acts done by architects as quasi-arbitrators. There is a further reason why they should be protected when so acting. If their decisions can thereafter be questioned in suits brought against them by either party, there is a real possibility that their decisions will be governed more by the fear of such suits than by their own unfettered judgment as to the merits of the matter they must decide. It is for this reason that architects, acting as quasi-arbitrators, have been held immune from suit. (Wilder v. Crook, 1948, 250 Ala. 424, 34 So.2d 832, 834 (dictum)); see Bever v. Brown, 1881, 56 Iowa 565, 9 N.W. 911; Jones v. Brown, 1880, 54 Iowa 74, 6 N.W. 140; Hoosac Tunnel Dock & Elevator Co. v. O'Brien, 1884, 137 Mass. 424, 50 Am. Rep. 323; but see Hutchins v. Merrill, 1912, 109 Me. 313, 84 A. 412, 42 L.R.A., N.S., 277 (dictum). An architect acts as a "quasi-arbiter" within this rule when, using the contract as a guideline, he resolves disputes between owner and contractor. (See Craviolini v. Scholer & Fuller Associated Architects, 1961, 89 Ariz. 24, 357 P.2d 611; cf. 43 A.L.R. 2d 1122, 1127 and cases therein cited). Thus in some instances the architect, as quasi-arbiter, may have to re-examine positions taken by himself as the owner's agent. Oregon immunizes state officials acting in a judicial capacity from suit, if they are acting within their jurisdiction, in order to prevent fear of suit from influencing their decisions. (Clifton v. Hawkins, 1959, 218 Or. 368, 345 P.2d 255; Shaw v. Moon, 1926, 117 Or. 558, 245 P. 318, 45 A.L.R. 600;

12. "The Architect shall have general supervision and direction of the work. He is the agent of the Owner only to the extent provided in the Contract Documents and when in special instances he is authorized by the Owner so to act, and in such instances he shall, upon request, show the Contractor written authority. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract.

"As the Architect is, in the first instance, the interpreter of the conditions of the Contract and the judge of its performance, he shall side neither with the Owner nor with the Contractor, but shall use his powers under the contract to enforce its faithful performance by both.

"The Architect shall, within a reasonable time, make decisions on all claims of the Owner or Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents. The Architect's decisions, in matters relating to artistics effect, shall be final, if within the terms of the Contract Documents. Except as above or as otherwise expressly provided in the Contract, all the Architect's decisions are subject to arbitration."

Wright v. White, 1941, 166 Or. 136, 110 P.2d 948, 135 A.L.R. 1; De Marais v. Stricker, 1936, 152 Or. 362, 53 P.2d 715). We presume that this policy extends to private persons acting in a quasi-judicial capacity within jurisdiction established by private agreement.

Some of the cases cited go so far as to hold (or say) that the immunity extends to fraudulent action by architects, or to action taken with wilful and malicious intent to injure one of the parties. With this we cannot agree. The dual position of the architect, as agent of the owner and quasi-arbitrator, is an anomalous one. It differentiates him, we think, from the judge or other public official who acts judicially or quasi-judicially, and from the ordinary impartial arbitrator. The architect is employed and paid by the owner, and he is often called upon to pass upon the sufficiency, accuracy, and adequacy of his own plans and specifications. There are thus strong pressures pushing him in the direction to being unfair to the contractor. We think he should be protected when he acts in good faith, however erroneously, and that such protection is enough. If he acts fraudulently, or with wilful and malicious intent to injure the contractor, he should be liable. (See: Craviolini v. Scholer & Fuller Associated Architects, supra, 1961, 89 Ariz. 24, 357 P.2d 611; Witherspoon, When Is An Architect Liable, 48 A.B.A. Jnl. 321, April, 1962).

We cannot say, on the record before us, that there is no issue of fact as to whether some of the actions of architects were wilful and malicious as charged.

■ ■ Moreover, architects may have done things that were harmful to Lundgren and that were outside the scope of their powers as agents or quasi-arbitrators. In that case, architects would be liable for wilful and malicious inducement of breach of contract. Oregon recognizes such an action. (Sloan v. Journal Publishing Co., 1958, 213 Or. 324, 324 P.2d 449; Ringler v. Ruby, 1926, 117 Or. 455, 244 P. 509, 46 A.L.R. 245; see Bliss v. Southern Pac. Co., 1958, 212 Or. 634, 321 P.2d 324). The action may be based on the defendant's intentionally rendering the plaintiff's performance to a third party valueless or more burdensome to the plaintiff. (See Ringler v. Ruby, supra, 1926, 117 Or. 455, 244 P. 509; see generally Carpenter, "Interference with Contract Relations", 41 Harv.L.R. 728–32). However, Oregon appears to recognize that an interference may be privileged and therefore not actionable. (See Gaddis v. Great Northern Railway Co., D.C.1959, 187 F.Supp. 918, aff'd 9 Cir., 284 F.2d 524; Sloan v. Journal Publishing Co., 1958, 213 Or. 324, 324 P.2d 449, 465). Under the contracts, such privilege exists as to action taken by architects in good faith, either as agents or quasi-arbitrators. But we think the privilege qualified, not absolute; it will not protect architects against actions taken in bad faith and with intent to injure Lundgren.

■ ■ The record does present a triable issue of fact as to whether architects acted with such a wrongful purpose, and whether any such action was outside of their authority as agents or quasi-arbitrators. Although the conclusory statements in Lundgren's complaint and his list of contentions in the pre-trial order are not evidence on a motion for summary judgment, (see Hardcastle v. Western Greyhound Lines, 9 Cir., 1962, 303 F.2d 182) Lundgren's answers to interrogatories and his deposition do raise a triable issue. In the latter Lundgren alleges acts by architects and circumstances from which it is reasonable to infer a wrongful purpose, i. e., past poor relations between Lundgren and one member of the architectural firm, their cutting down Lundgren's estimates "too much", their ordering needless expenditures in completing the high school after Lundgren's employment was terminated, various allegedly untrue assertions by them and an inspector employed by them at the special meeting in which school district decided to terminate Lundgren's employ-

ment, their ordering Lundgren to redo work allegedly done strictly according to the plans and specifications, their telling subcontractors that they would be paid by school district and not by Lundgren, and their demanding that Lundgren pay subcontractors before payment was due them. Lundgren offered no direct evidence that there in fact was a wrongful purpose. But we think that he presented evidence from which that purpose can be inferred, and architects made no affirmative showing of their own good faith. They were the moving parties.

With the preceding in mind, we examine Lundgren's claim against architects for damage to reputation and credit standing. Much of this cause rests on architects' advising school district at its special meeting of June 26, 1952 to terminate Lundgren's employment. We think there is a triable issue of fact as to whether architects acted as agents of school district or as quasi-arbitrators. (It was at the special meeting that architects made the alleged untrue assertions to school district about the quality of Lundgren's work). One factor suggesting that architects acted as quasi-arbitrators is that they acted pursuant to Article 19, the termination for breach provision. (See footnote 1, supra). However, prior to the meeting of June 26, neither school district nor architects as its agent, appear to have informed Lundgren that they thought the job he was doing was inadequate under the contract. There appear to have been only vague threats by architects and a refusal by them to prepare a "final list". Evidently Lundgren was not even informed at the special meeting that termination of his employment was in the offing. Further, it was after termination that architects hired the firm of Messrs. Faye & Associates, Inc. to prepare a survey report on the job done by Lundgren. Like the issue of wrongful purpose, we feel that the issue as to the existence of quasi-arbitrators' qualified immunity is a question of fact. The architects are immune only if they were actually acting in a judicial capacity within their jurisdiction.

To sumarize, we hold that, insofar as architects acted as agents or quasi-arbitrators, Lundgren has elected his remedy and cannot now recover from them any of the damages passed upon by the arbitrators, whether allowed or disallowed by them. If Lundgren asserts that the judgment against school district is uncollectible, he can then recover only that part of the damages involved in the arbitration that he can prove to be the result of wilful and intentional misconduct by architects, which is enough if architects were acting as agents, or were also intended to injure him, which is required if architects were acting as quasi-arbitrators. If Lundgren can prove that architects did anything to his damage that was not within the scope of their authority as agents or quasi-arbitrators, he can recover such damages as naturally flow from that action. As to such action, he need only show that it was wilful and intentional; he need not show a specific intent to injure him. Loss of credit standing and damage to his reputation as a builder may be within the damages recoverable, if it can fairly be said that, under the circumstances, such damages were reasonably foreseeable. If requisite malice is shown, punitive damages may follow.[13]

While the case is not one in which it was appropriate to enter a summary judgment for architects, it may well be one in which the type of order con-

---

13. Although Oregon allows recovery for exemplary damages, recovery is limited to cases where there is so great an element of malice, fraud, or gross negligence that the court feels the offender should be assessed additional damages by way of punishment and as a warning to others. (Martin v. Cambas, 1930, 134 Or. 257, 293 P. 601; Cays v. McDaniel, 1955, 204 Or. 449, 283 P.2d 658). Exemplary damages, however, can never constitute the basis of a cause of action. (Martin v. Cambas, supra, 1930, 134 Or. 257, 293 P. 601; Weaver v. Austin, 1948, 184 Or. 586, 200 P.2d 593.)

templated by Rule 56(d), F.R.Civ.P. could be entered, thereby very substantially narrowing the issues to be tried. (See discussion, 29 F.R.D. 307–310).

The order of December 15, 1958, from which Lundgren appeals, is affirmed. The judgments from which school district appeals (June 17, 1954, as revised March 21, 1957, and April 22, 1957) are each affirmed, except those portions thereof relating to interest thereon, which portions are reversed. The summary judgment in favor of architects (November 7, 1960), is reversed. The matters reversed are remanded for further proceedings not inconsistent with this opinion.