**TRANSPAC CONSTRUCTION CO., Inc.,**
a California corporation, Plaintiff-
Appellant,

v.

**CLARK & GROFF, ENGINEERS, INC.,**
et al., Defendants-Appellees.

Nos. 25485, 26306.

United States Court of Appeals,
Ninth Circuit.

Aug. 10, 1972.

---

Arden E. Shenker (argued), William G. Sheridan, Jr., of Tooze, Powers, Kerr, Tooze & Peterson, Portland, Or., for plaintiff-appellant.

Stewart M. Whipple (argued), Alan H. Johansen, of Seitz, Whipple & Johansen, Portland, Or., Clarence R. Wicks, of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., Raymond Graves, of Murray, Scott, McGavick & Graves, Tacoma, Wash., for defendants-appellees.

Before HAMLEY and KOELSCH, Circuit Judges, and SWEIGERT, District Judge.*

HAMLEY, Circuit Judge:

Transpac Construction Co., Inc. (Transpac) brought this Oregon diversity action against Umpqua Basin Water Association, Inc. (Umpqua), Clark & Groff, Engineers, Inc. (Clark & Groff), and Arthur V. Faulkner, to recover damages in the sum of eight hundred and fifteen thousand dollars for negligent and intentional interference with the performance of a contract. The contract is one under which Transpac undertook to install, for Umpqua, a pipeline for a domestic water supply system in Roseburg, Oregon. Clark & Groff engineered the water supply system and supervised its installation. Faulkner served as Umpqua's resident engineer on the project.

A trial was had before United States District Judge Gus J. Solomon on limited issues, including the issue of whether Umpqua and Transpac compromised and settled Transpac's claim against Umpqua. As a result of this trial, and on October 22, 1969, Judge Solomon entered findings of fact (amended November 17, 1969), conclusions of law, and a judgment dismissing the action as to Umpqua.[1] Transpac took a timely appeal from this judgment.

On March 13, 1970, the parties entered into a stipulation under which the action was dismissed as to Faulkner. After entry of a second pretrial order[2] pertaining to Transpac's claims against Clark & Groff, Clark & Groff moved for summary judgment in its favor. This motion was made on the ground that, under the undisputed facts, the compromise and settlement which had operated to release Umpqua from liability to Transpac, also served to release Clark & Groff from liability to Transpac. The parties argued the motion before United States District Judge (now Circuit Judge) Alfred T. Goodwin, who thereupon granted the motion. Transpac filed a timely notice of appeal, and Transpac's two appeals have been consolidated for argument and disposition in this court. Appellee Umpqua has made no appearance in this court.

On appeal, Transpac first argues that Judge Solomon erred in finding and concluding that Umpqua and Transpac had, by agreement of March 15, 1967, fully settled and compromised all claims which Transpac here asserts against Umpqua.

On August 29, 1966, Transpac and Umpqua entered into a contract for the installation, by Transpac, of a domestic water supply system for the agreed amount of $695,864.54. Shortly thereafter work began under the contract. Commencing in early October 1966, various disputes arose between Transpac and Umpqua concerning the performance of each party to the contract. Judging by Transpac's contentions set forth in the original pretrial order, Transpac's grievances which were ap-

---

* The Honorable William T. Sweigert, United States District Judge for the Northern District of California, sitting by designation.

1. This judgment was made final by the inclusion, in the conclusions of law, of an express determination and direction of the kind referred to in Rule 54(b), Federal Rules of Civil Procedure.

2. An initial pretrial order, supplanting the pleadings, had been filed prior to the trial before Judge Solomon.

parently dealt with in these disputes covered a wide range, as summarized in the margin.[3]

Judge Solomon found and concluded that, on March 15, 1967, Transpac and Umpqua reached an agreement by which they intended to and did settle all claims that Transpac had against Umpqua, including those arising out of tortious acts as well as from breach of contract. The reference here was to a letter dated March 15, 1967, which had been dictated by Transpac's attorney, Dudley C. Walton, in the presence of Umpqua's attorney, Warren A. Woodruff. The pertinent part of this letter is quoted in the margin.[4] In the other portions of the letter new contractual arrangements were specified adjusting contract price payments and deleting items of work that the contractor need not perform.

In contending that the letter of March 15, 1967 did not constitute a release of all of Transpac's claims against Umpqua, Transpac asserts that the letter resolved only the items concerning which Transpac had demanded arbitration, and not the additional items involved in this lawsuit. Transpac calls attention to the statement, in the second paragraph of the March 15, 1967 letter, that the "dispute . . . has been the subject of claim and demand for payment by Transpac . . . under the terms of the

3. Transpac contended that Umpqua intentionally, maliciously, knowingly and wilfully, through the acts of its officers and agents, interfered with the performance of Transpac's contract in the following particulars:
    (a) allowing an officer of Umpqua to act in behalf of Umpqua after Umpqua had learned of his improper conduct on the construction project; (b) failing and refusing to provide Transpac with required rights-of-way and easements; (c) failing and refusing to consult and cooperate with qualified engineering personnel; (d) allowing a false preliminary control estimate to be prepared and made available to prospective bidders, including Transpac; (e) allowing defendant Faulkner, an unqualified person, to make engineering decisions and direct Transpac in engineering matters; (f) withholding from Transpac revised plans which were necessary for Transpac to have in order to accurately plan construction in progress; (g) through its agent, Faulkner, (1) allowing the original specifications to be revised without first obtaining approval from the project engineer or submitting written change orders to Transpac, (2) allowing Transpac to complete portions of the work, or commence work, before notifying Transpac of revised plans, (3) failing to give timely approval of work done by Transpac, (4) failing and refusing to mark pipeline course stakes, and authorizing Transpac to install certain air relief valves in the pipeline only to direct later that the air relief valves were inadequate, (5) allowing and causing harassment of Transpac's workmen and subcontractors, (6) communicating information to union officials for the purpose of creating, without cause, labor disputes, (7) misrepresenting Transpac's finances to others for the purpose of harassing Transpac, (8) uttering statements intended to discredit Transpac's general business reputation, and (9) refusing to comply with contract requirements for resolving disputes.

4. "This letter will memorialize settlement of the dispute existing between our respective clients on moneys due Transpac Construction Co. for performance of it's [sic] contract with Umpqua Basin Water Association, Inc. This dispute having arisen by reason of changes ordered by the owner in the work to be performed under said contract by the contractor and other conditions and circumstances under which the contractor performed the work ordered by the owner.
    "The dispute which has arisen between Umpqua Basin Water Association, Inc. and Transpac Construction Co. on this matter has been the subject of claim and demand for payment by Transpac Construction Co. under the terms of the contract providing for arbitration through the American Arbitration Association. It is understood that the settlement agreement memorialized by this letter is not an acknowledgment by the Umpqua Basin Water Association of any liabilities on their part other than the terms of the contract and the bid award or by Transpac Construction Co. of the amounts due to them under their claim under the terms of this settlement agreement, and subject to the funds being available to Umpqua Basin Water Association, Inc. from the Farm Home Administration for the payment of the amount to be paid Transpac Construction Co. under this settlement."

466 F.2d—52½

contract providing for arbitration . . ."; and also comments that the letter is not couched in terms of a general release.

■ In our opinion the March 15, 1967 letter is ambiguous insofar as the scope of the settlement is concerned. It is true that the term "release" is not used, and that the second paragraph relates the dispute to Transpac's arbitration demand. But the first paragraph of the letter states that the dispute had arisen by reason of changes ordered by the owner "and other conditions and circumstances under which the contractor performed the work ordered by the owner." All of Transpac's grievances against Umpqua asserted in this action, as summarized in note 3, pertain to "conditions and circumstances under which the contractor performed the work ordered by the owner."

By reason of this ambiguity it was entirely proper for the parties to produce extrinsic evidence bearing upon the scope of the settlement memorialized by the March 15, 1967 letter, and they proceeded to do so. This evidence was both documentary and oral. After considering this evidence, the trial court found that, during the negotiations, the parties considered all claims which Transpac had against Umpqua. While Transpac challenges this finding of fact, we are convinced that it is not clearly erroneous. In our opinion, save for the considerations to be explored below, this finding taken in conjunction with the wording of the letter, warranted Judge Solomon in concluding that the March 15, 1967 letter constitutes a full and final settlement of all claims which Transpac is asserting against Umpqua.

■ But Transpac argues that, under Oregon law, a release is not binding unless it results from a meeting of the minds and unless it is executed by the party releasing a claim with knowledge of what he is signing and with the intent to discharge the asserted liability. Transpac then refers to testimony by Transpac's attorney, Walton, that at the time the settlement negotiations were in progress, he was aware that Transpac wanted to be in a position to assert tort claims against Umpqua after the March 15, 1967 settlement had been effectuated. Transpac also notes that, at that time, Walton did not know what Umpqua's attorney believed, "but suspected that Umpqua and its attorney thought they were settling all claims." Judge Solomon found as to this matter:

"Although plaintiff knew that defendant Umpqua relied on the settlement agreement as a full and final settlement of all disputes between the parties, plaintiff did not disclose to defendant Umpqua that any claims were excluded from the settlement."

It thus appears that Transpac is urging that, under Oregon law, one party to an executed settlement agreement, although knowing before execution that the other party considers that the written agreement will operate as a full release, may defeat that expectation by secretly intending that the settlement be of limited scope. We do not believe Oregon decisional law requires such an unjust result. We further observe that the argument proves too much because if there were no "meeting of minds" under this theory, it would operate to render the settlement entirely inoperative instead of merely limiting its scope. *See* Brown v. Denton, Or., 477 P.2d 710, 712 (1970). Yet Transpac has proceeded as if the March 15, 1967 letter was at least partially operative.

In support of its unique theory, Transpac relies primarily upon Brown v. Denton, *supra*. That case was a suit for the dissolution of a partnership. The defendant partners defended on the basis that, subsequent to the filing of the plaintiff's complaint, the parties had entered into a verbal agreement dissolving the partnership, distributing the assets, and giving mutual releases of all claims of any nature. The issue of whether there had been such a verbal settlement agreement was segregated and tried. The plaintiff urged that no such agreement had been entered into because the

parties had not reached agreement on whether a full release would result.

The evidence in Brown v. Denton showed that the defendants thought they were settling all claims, and the plaintiff strongly suspected that the defendants had such a belief. But since all parties understood that the oral arrangements were to be reduced to writing, the plaintiff decided to await presentation of the proposed written agreement before making known, if then necessary, his intention not to grant a general release. When the defendants presented the written form to the plaintiff he refused to sign it because, among other things, it contained a general release.

In the partnership dissolution action the defendants therefore relied upon an asserted oral settlement agreement. The Oregon Supreme Court held that, under these circumstances, no binding oral agreement had been entered into because there was no meeting of the minds.

One important factual difference between Brown v. Denton and our case arises from the fact that, in Brown, it was established that the party who purportedly granted the release never had any intention of doing so. In our case, while Walton, Transpac's attorney, gave testimony from which it could be inferred that Transpac had no intention of granting a general release, the trial court found otherwise. As noted above, Judge Solomon expressly found that on or about March 15, 1967 the parties reached an agreement "by which they intended to and did settle all claims that plaintiff had against defendant Umpqua. . . ." [5]

A perhaps more fundamental difference between Brown and this case lies in the fact that while, in both, a written settlement agreement was contemplated, the plaintiff in Brown disclosed, when the agreement was presented, that he would not grant a general release. In our case, by contrast, no such disclosure was made.

If, in Brown, the tendered written agreement had not contained a general release clause but instead the plaintiff, without disclosing his objection to a general release, had bound himself to that contract, and if the negotiations in Brown covered essentially all of the claims later asserted in the action, that case would have closely paralleled the one before us. We do not know what the Oregon Supreme Court would have held under such circumstances.

But we do know that, in holding for the Brown plaintiff, that court was primarily concerned with keeping oral negotiations towards settlements on an informal basis.[6] There is no such problem here; rather the question is whether a party to a written agreement may escape its binding effect because he entertained a secret intent contrary to what he knew to be the intent of the other contracting party. In our opinion, Brown v. Denton does not require us to place our judicial imprimatur upon such deceptive conduct.

We have examined the other Oregon cases cited by Transpac but are not convinced that they support Transpac's position.

■ However, Transpac further contends that, on March 15, 1967, Transpac did not know what damages would arise later and therefore could not then have intelligently released "inchoate" claims.

---

5. If this means that the trial judge disbelieved Walton, this is all the more reason why we should not overturn the finding. The determination of a witness' credibility rests with the trial court.

6. As the Brown court said, at 477 P.2d 712:
   "Defendants argue that settlements are favored in the law and, in such a situation, plaintiff should be bound. Under such circumstances, the court believes that there is more to be lost than gained by binding parties in the position of plaintiff. A subsequent written agreement was contemplated by the parties. In such a situation, if a party is bound by unmentioned provisions favorable to his adversary, which provisions there is reason to believe his adversary might contemplate, it would be dangerous to negotiate, and a damper would be put on settlements."

In support of this argument, Transpac cites Reynolds v. Merrill, 23 Utah 2d 155, 460 P.2d 323 (1969). *Reynolds* was a personal injury case in which the defendant relied upon a release. In holding for the plaintiff, the Utah Supreme Court drew a distinction between an *unknown injury* and *unknown* consequences of a *known injury*, holding that the former, but not the latter, can warrant the setting aside of the release because of a mutual mistake of fact.

If this personal injury case has sufficient relevance to be considered at all in our case, we think it provides little support for Transpac's position. The "injuries" of which Transpac complains in this suit were known on March 15, 1967 when from ninety-seven to ninety-nine per cent of the work had been completed. The extent of damages Transpac would ultimately sustain because of these known "injuries" was uncertain on that date, but *Reynolds* teaches that this is not a good reason for setting aside a settlement agreement.

We hold that Judge Solomon did not err in determining that the agreement of March 15, 1967 released Umpqua from all claims Transpac is asserting in this action. Our review of the Oregon cases persuades us that the appellate courts of Oregon would probably reach the same result.

Transpac also argues that, however effective the March 15, 1967 agreement may have been in releasing Umpqua from Transpac's claims, it did not release Clark & Groff from the claims Transpac asserts against it in this action. As noted earlier in this opinion, Judge Goodwin held to the contrary in granting summary judgment for Clark & Groff. Judge Goodwin based this determination upon the theory that, at all times in question, Clark & Groff was acting as Umpqua's agent, and is therefore entitled to the benefits of the set-tlement agreement between Transpac and Umpqua.

On December 17, 1965, which was more than eight months before Transpac and Umpqua entered into the contract for the installation of the water distribution system, Clark & Groff entered into an agreement with Umpqua to furnish professional engineering services to Umpqua for the installation of that system. This contractual relationship between Clark & Groff and Umpqua apparently continued throughout the entire period here in question. Clark & Groff had no contractual relationship with Transpac.

According to Transpac's contentions, as set out in the second pretrial order, Clark & Groff negligently and intentionally interfered with Transpac's performance of its responsibilities under the installation contract in eleven specific factual respects. Each of these specified grievances echoes one or more like grievances Transpac urged against Umpqua, summarized in note 3.[7] It therefore appears that the things complained of were, in essence, the same grievances which Transpac urged against Clark & Groff's principal, Umpqua, which latter grievances have been fully settled and compromised between Transpac and Umpqua. Thus we do not accept the broad statement in Transpac's brief, that "The liability of Clark & Groff was predicated on separate and distinct acts totally disassociated from those of Umpqua."

Transpac argues that Clark & Groff was not released by the settlement between Transpac and Umpqua because Clark & Groff was not mentioned in the letter of March 15, 1967, and Transpac at no time expressed an intention to release that defendant, or had such an intention. Categorizing Clark & Groff and Umpqua as joint tort-feasors, Transpac invokes the modern rule that the

7. Transpac's specific complaints against Clark & Groff, as set out in Part IV, section A of the second pretrial order, followed by the correlative complaints Transpac leveled against Umpqua, as set out in note 3, are as follows: (1)–(d) ; (2)–(e) ; (3)–(a) ; (4)–(a), (e) and (g) ; (5)–(g)(1) ; (6)–(f) ; (7)–(f) and (g)(4) ; (8)–(g)(2) and (4) ; (9)–(g)(3) ; (10)–(g)(5) ; and (11)–(g)(8).

release of one joint tort-feasor does not release other joint tort-feasors who are not parties to nor named in the release. Transpac cites Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 501, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964), and Cranford v. McNiece, 252 Or. 446, 450 P.2d 529 (1969) in support of its position.

■ Both *Aro* and *Cranford* pertain to joint tort-feasors who were strangers to each other. In our case one joint tort-feasor, Clark & Groff, was the agent of the other tort-feasor, Umpqua, and all of Clark & Groff's acts complained of were performed in Clark & Groff's capacity as Umpqua's agent.[8] This difference in factual setting calls for application of a different rule from that invoked by Transpac. The different rule is that, absent circumstances indicating a contrary intention, when a contractor releases the owner upon settlement of a dispute over the amount owed under the contract, the owner's engineer or other supervisory agent is also absolved from like claims, in tort as well as contract. *See* Cox v. City of Freeman, Mo., 321 F.2d 887, 892 (8th Cir. 1963), and authorities there cited.

■ We recognize, as Transpac urges, that technically speaking, Clark & Groff's status was not that of Umpqua's agent, but that of an independent contractor. Moreover, as an independent contractor, Clark & Groff not only rendered engineering service to Umpqua, but acted as a quasi-arbitrator between Umpqua and Transpac under section 2.-3.02 of the prime contract.[9] In this respect, Clark & Groff's position was analogous to that of the architects in Lundgren v. Freeman, 307 F.2d 104 (9th Cir. 1962), an Oregon diversity action.

In *Lundgren* we observed that the independently-employed architects, in that case, were acting in one of three capacities, either (1) as agents of the school district, (2) as quasi-arbitrators, or (3) on their own, in the sense that they were not acting as agents or as quasi-arbitrators. The court, in *Lundgren,* held, at 307 F.2d 117–118, that under Oregon law the architects had no liability to the contractor for any of their acts performed in good faith, even though done negligently or erroneously. The court also held that, as to the architects' actions in their capacity as agents, they were not liable even for intentionally malicious actions.

The court ruled, however, that liability might be established if the contractor could prove that the architects, either in their capacity as quasi-arbitrators or on their own, outside the scope of their powers as agents or quasi-arbitrators, had acted fraudulently or with wilful and malicious intent to injure the contractor. 307 F.2d at 118.

As noted above, Transpac's factual contentions against Clark & Groff in the second pretrial order are echoes of the similar contentions made against Umpqua in the first pretrial order. We can only conclude that, while Clark & Groff was an independent contractor, Transpac's claims against the engineering firm are grounded solely in that firm's activities as Umpqua's agent, and not in anything Clark & Groff may have done as quasi-arbitrator or as an independent entity. In these circumstances, we think the rule of *Lundgren,* that the supervisory agent, as agent, is not liable even for its intentional torts, is fully applicable here.

It is true that the event which led to announcement of the rules in *Lundgren*

---

8. It may be questioned whether Umpqua's acts complained of by Transpac can be correctly termed those of a "tort-feasor," rather than acts in asserted breach of contract. But that is how Transpac characterizes Umpqua for the purpose of this argument.

9. Section 2.3.02 provides:
   "*Engineer's decisions.* All claims of the owner or the contractor shall be

presented to the engineer for decision which shall be made in writing within a reasonable time. All decisions of the engineer shall be final except in cases where time and/or financial considerations are involved which shall be subject to arbitration."

was the contractor's earlier election to proceed to arbitration with the owner rather than to sue the architects. In our view, however, Transpac's release of Umpqua's alleged tort liability in the present case provides an equally valid basis for applying the *Lundgren* rule concerning agents' liability to Transpac's claims against Clark & Groff. We intimate no opinion as to whether the other rules of *Lundgren* concerning liability of quasi-arbitrators and independent actors would likewise be triggered by a release executed between the owner and the contractor. We do conclude, however, that Transpac's earlier release of Umpqua bars Transpac's recovery against Clark & Groff for acts performed as Umpqua's agent, rather than as a quasi-arbitrator or independent entity.

We hold that the trial court did not err in granting summary judgment to Clark & Groff and dismissing the action with prejudice.

Affirmed.