**KITTITAS RECLAMATION DISTRICT; United States of America et al., Appellees,**

v.

**SUNNYSIDE VALLEY IRRIGATION DISTRICT et al., Appellants.**

No. 78–3065.

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 13, 1980.

Decided July 28, 1980.

Rehearing Denied Sept. 10, 1980.

Charles C. Flower, Yakima, Wash., for appellants.

Thomas G. Nelson, Twinfalls, Idaho, Anne S. Almy, Dept. of Justice, Washington, D.C., argued, for appellees; Donald H. Bond, Yakima, Wash., James W. Moorman, Asst. Atty. Gen., Washington, D.C., Robert M. Sweeney, Spokane, Wash., Daniel R. Peterson, Sunnyside, Wash., on brief.

Before DUNIWAY and ANDERSON, Circuit Judges, and BONSAL, District Judge.*

* The Honorable Dudley B. Bonsal, Senior United States District Judge, Southern District of New York, sitting by designation.

J. BLAINE ANDERSON, Circuit Judge:

In this action, as part of its continuing jurisdiction over a consent decree entered in 1945, the district court entered a Memorandum and Order interpreting and administering the consent decree. Sunnyside Valley Irrigation District (Sunnyside) appeals that Memorandum and Order.

## I. *FACTS*

This case had its genesis in a declaratory action in 1939. The action had been instituted to determine the obligation of the United States Bureau of Reclamation to deliver water to the Sunnyside Valley Irrigation District, which was situated in the Yakima Reclamation Project. A cross-complaint was also filed in the case requesting the court to determine the respective water rights of users of the waters of the Yakima River and its tributaries.

During the pendency of this action, the decision in *Fox v. Ickes*, 137 F.2d 30 (D.C. Cir.), *cert. denied*, 320 U.S. 792, 64 S.Ct. 204, 88 L.Ed. 477 (1943), was rendered. That decision, which dealt with the same Yakima Reclamation Project, essentially decided the issue of the obligation of the Bureau of Reclamation to deliver water within the Project. It was determined that the water rights of the irrigation districts and other water users were property rights acquired by their beneficial use of the water and were not merely contractual rights with the Bureau of Reclamation. While the Bureau of Reclamation was not obligated to furnish any more water than was available, the court determined that the Bureau was obligated to distribute the available water according to the priorities of the parties that had been established according to the law of the State of Washington. *Id.* 137 F.2d at 33.

After the decision in *Fox v. Ickes*, only the issue of the actual priorities of the individual water users was left undecided. However, the parties in this case elected not to continue the adjudication over that issue. Instead, they agreed upon the 1945 consent decree.

The consent decree established an allocation schedule which defined the obligation of the Bureau of Reclamation "to deliver water from the natural flow of the Yakima River, and its tributaries, from storage in its various reservoirs on the Yakima watershed, and from other sources, to the plaintiffs, to the defendants, and to the Wapato Indian Irrigation Project." (Record at 145). As a result of the consent decree, the parties, such as appellant Sunnyside, were accorded certain non-proratable allocations of water, and others, such as appellee Roza Irrigation District (Roza), were accorded proratable allocations of water in exchange for their claimed water rights.

No major problems arose in regard to the consent decree until 1977 when a severe drought affected the area. Faced with the prospect of a record drought, parties to the decree invoked the district court's continuing jurisdiction over matters of interpretation and administration of the consent decree. (Record at 173). Among the several motions filed with the district court was a motion by the United States for authorization of a plan for pumping dead storage water from the Lake Cle Elum Reservoir (a reservoir within the Yakima Reclamation Project). The motion was denied as the district court ruled that the pumping of dead storage water from the reservoir was outside the provisions of the consent decree; thus, it could neither authorize nor prevent the pumping. (Record at 448).

The Bureau proceeded to install the pumps in the reservoir and an emergency permit to pump the dead storage water was granted by the State of Washington. The irrigation problems that were anticipated did not develop, however, and no water was actually pumped in that year.

On March 13, 1978, Roza filed a motion in district court seeking an interpretation of the consent decree. The motion sought an interpretation that the "dead storage water from the Lake Cle Elum Reservoir was not available from storage at the time of the entry of the 1945 [consent decree] and therefore [was] not part of the total water supply available as the same is defined and

covered in . . . said judgment." (Record at 461). In a memorandum responding to that motion, the United States supported the interpretation sought by Roza. The United States also stated that another issue raised by the motion was whether rights in the "live storage" water could be protected if the dead storage water were withdrawn.

In its Memorandum and Order, the district court ruled that the dead storage water in the Lake Cle Elum Reservoir was not water that was subject to the 1945 consent decree; the dead storage water was "project water," and that the dead storage water could be withdrawn through pumping for the use of the parties financing the pumping project, but only after permission had been granted by the State of Washington to withdraw the water, and full provision had been made for the monthly allocations under the 1945 consent decree.

Sunnyside appeals that Memorandum and Order, contending that the dead storage water was part of the total water supply subject to the consent decree; and the dead storage water was not project water.

## II. DISCUSSION

### A. Dead Storage

The primary issue on appeal is whether the dead storage water in the Lake Cle Elum Reservoir is covered by the 1945 consent decree. Dead storage capacity is defined as that volume of a reservoir below the level of the lowest outlet. "Dead storage" water then is water that cannot be drained by gravity flow through outlets. 7 Waters and Water Rights 276 (Clark ed. 1976).

Under the consent decree, the "total water supply available" is defined as "that amount of water available in any year from natural flow of the Yakima River, and its tributaries, from storage in various Government reservoirs on the Yakima watershed and from other sources to supply the contract obligations of the United States to deliver water and to supply claimed rights to the use of water on the Yakima River,

and its tributaries, heretofore recognized by the United States." (Record at p. 170). This definition of "total water supply available" does not explicitly deal with the dead storage water. However, since the definition could be fairly construed to either include or exclude dead storage water, it was subject to construction by the district court. See, *U. S. v. ITT Continental Baking Co.,* 420 U.S. 223, 233–238, 95 S.Ct. 926, 932–935, 43 L.Ed.2d 148 (1975).

In construing a consent decree, its scope must be discerned within its four corners. *U. S. v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). However, a consent decree is in many ways like a contract and a court may consider surrounding circumstances as aids in construing the consent decree. *U. S. v. ITT Continental Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935.

In interpreting contracts, factual findings of relevant surrounding circumstances are reviewed under the clearly erroneous standard. However, interpretation of the contract is a matter of law and is reviewable as such. *Libby, McNeil and Libby v. City National Bank,* 592 F.2d 504, 512 (9th Cir. 1978); see *Republic Pictures Corp. v. Rogers,* 213 F.2d 662, 664–665 (9th Cir.), cert. denied, 348 U.S. 858, 75 S.Ct. 83, 99 L.Ed. 676 (1954). The same standard of review will be applied here to the district court's construction of the consent decree.

Before, during and after the filing of the consent decree, the only waters that had been put to beneficial use were waters that were made available through gravity flow. No beneficial use had been made of the dead storage water. It was not until 1977, when the United States installed pumps on the Lake Cle Elum Reservoir, that the availability of dead storage water for beneficial use became a reality.

Recognizing these facts, the district court, in its Memorandum and Order of July 13, 1978, determined that the "withdrawal of dead storage waters from Lake Cle Elum was not within the contemplation of the parties when the 1945 decree was entered." (Record at 514). The consent

decree was thus interpreted to exclude the dead storage water from its coverage. We find no error in the district court's reasonable interpretation of the consent decree and we affirm.

### B. *Project Water*

■ The district court also ruled that the dead storage water was "project water." We agree. "Project water" is water that would not be available for irrigation use "but for the fact that it has been developed by the United States. *Israel v. Morton,* 549 F.2d 128, 132 (9th Cir. 1977). Here, the installation of the pumps brought about the availability of the dead storage water for irrigation use. In that sense, the dead storage water was developed by the United States and was thus project water.[1]

### C. *Withdrawal of Dead Storage Water*

■ The district court was aware that the withdrawal of the dead storage water could adversely affect the rights of the users under the 1945 consent decree. The district court, in administering the consent decree, therefore, set out procedures for the withdrawal of the dead storage water. The procedures were designed to protect parties to the consent decree from interference with their "rights to the use or the delivery of those quantities of water which are recognized" under the consent decree.[2] (Record at 172).

The only issue raised regarding those procedures relates to the authority granted to the watermaster in monitoring the withdrawals. Appellees Union Gap Irrigation District and Yakima Valley Canal Company voice concern that the authority granted to the watermaster is too broad. While we do not believe that the watermaster's authority is too broad, we emphasize that the discretion the watermaster has in monitoring and allowing the withdrawal of the dead storage water is limited by the priority rights under the consent decree and is subject to the supervision of the district court.

The district court's order is thus

AFFIRMED.

1. While the dead storage water is project water, and its allocation will be determined by the United States and relevant federal laws, *Israel v. Morton,* 549 F.2d at 132–133, the district court correctly ruled that the withdrawal of the dead storage water is subject to appropriate state laws and regulations. *See California v. U. S.,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).

2. The procedures established by the district court provided that:
"Therefore, 'dead storage' water in Lake Cle Elum reservoir may only be withdrawn for use of movant and its participating districts after full provision is made for the monthly allocation under the 1945 decree. It shall be the duty of the watermaster heretofore appointed by the Court to monitor withdrawal and to order cessation of pumping of 'dead storage' water whenever, in his judgment, withdrawal is depriving 1945 decree users of their priority allocations. The Court is aware that this method of attempting to make a reasonable and equitable solution to problems created by drought years may result in some interference with 1945 decree users' rights due to miscalculations by the watermaster, sudden changes in natural flow or time lapse. In such instance, the withdrawal of these 'dead storage' waters must be discontinued until natural flow has fully restored the 1945 decree water and all such deficiency shall be charged against the withdrawing parties' (of 'dead storage' water) subsequent year's allocation."
(Record at 515–516).