**Roy L. STINNETT, Plaintiff-Appellant,**

v.

**DAMSON OIL CORPORATION, Defendant-Appellee.**

No. 78–2815.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 30, 1980.

Decided March 20, 1981.

Rehearing Denied May 28, 1981.

Before MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals, WALLACE and HUG, Circuit Judges.

MARKEY, Chief Judge.

Roy L. Stinnett (Stinnett) appeals from a final judgment of the District Court for the Central District of California in this suit for breach of contract against Damson Oil Corporation (Damson). We reverse.

### Background

Underlying this litigation are tide and submerged oil and gas leases in the Venice Oil Field in Los Angeles County, California, together with equipment used in operating the field (collectively, the Property). As of July, 1975, the Property included seven oil and gas wells, producing approximately 400 to 450 barrels per day. The oil was subject to price regulations established under the Federal Energy Administration (FEA).

On July 21, 1975, Stinnett, doing business as the Stinnett Oil Company, entered an Acquisition Agreement, contracting to buy the Property from Mobil Oil Corporation (Mobil). In August, 1975, Stinnett paid Mobil a deposit of $100,000 toward the $1,000,-000 purchase price but, before Mobil could close the sale it had to obtain consent from the City of Los Angeles (City) to assign one of the leases. The transaction was scheduled to close after that consent was obtained.

Stinnett arranged to borrow the $900,000 balance of the purchase price from United California Bank (UCB). On November 6, 1975, City consented to assignment of the lease.

Meanwhile, Damson had become interested. On December 11, 1975, Stinnett accepted terms for the preparation of a Basic Agreement under which Damson would acquire Stinnett's position in the Mobil Contract. On December 31, 1975, the Basic

Mitchel J. Ezer, Los Angeles, Cal., for plaintiff-appellant.

Cheryl White Mason, O'Melveny and Meyers, Los Angeles, Cal., for defendant-appellee.

---

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

Agreement was entered into by Stinnett, Damson, and a recently formed corporation which became subsidiary of Damson (Subsidiary).[1] Under that agreement, Damson acquired Stinnett's position in the July 21, 1975, Acquisition Agreement with Mobil. The Basic Agreement acknowledged a Stock Purchase Agreement of even date, under which Stinnett sold his 99 shares in Subsidiary to Damson for $99. The Basic Agreement also recited that:

> Concurrently herewith [Subsidiary] is acquiring from Mobil the Property in consideration of $1,000,000, payable $800,000 in cash and $200,000 by an unsecured promissory note (the "Note") from [Subsidiary] to Mobil.

> In connection therewith, [Subsidiary] is borrowing $800,000 from United California Bank ("UCB") secured by a deed of trust (the "Trust Deed") on the leasehold estate conveyed to [Subsidiary] by the Leases, and the Note, secured by the Trust Deed, is guaranteed by Damson.

In consideration of Stinnett's arranging the sale of the Property from Mobil to Subsidiary and the sale of Stinnett's stock in Subsidiary to Damson, Damson agreed in the Basic Agreement to pay to Stinnett:

(a) 12,500 shares of Damson common stock;

(b) Cash in an amount not to exceed $30,-000 as reimbursement for Stinnett's expenses in connection with acquisition of the Property from Mobil; and

(c) A five percent (5%) overriding royalty subject to specified terms and conditions.

The Basic Agreement recognized that, because of the Energy Policy and Conservation Act (Act), enacted December 22, 1975, the economic return on the investment by Damson and Subsidiary could be materially and adversely affected. Accordingly, Damson and Subsidiary reserved the option to rescind the acquisition of the Property from Mobil if the FEA did not promulgate regulations by March 1, 1976, or if price regulations promulgated before that date did not meet specified criteria.

As part of the option to rescind, Subsidiary and Mobil entered into a Repurchase Agreement, also dated December 31, 1975, whereby Mobil agreed to repurchase the Property from Subsidiary in the event of adverse FEA regulations. In that event:

> [Subsidiary] shall have the option, in its sole discretion, within 15 days following promulgation of such regulation or March 1, 1976, whichever first occurs, to give written notice to Mobil of [Subsidiary's] election to exercise its rights hereunder, and, thereupon the parties hereto covenant and agree to take the following actions on the tenth (10th) day next following receipt of the aforementioned notice:

> (a) [Subsidiary] shall reassign the Leases and reconvey the Personal Property to Mobil in the same form as the conveyances of the Property from Mobil to [Subsidiary].

> (b) Mobil shall return the Note to [Subsidiary], and no interest shall be due or payable on the principle thereof for any period during which Mobil held the Note.

> (c) Mobil shall pay to [Subsidiary] the sum of $800,000 in full consideration for the reconveyance of the Property from [Subsidiary] to Mobil.

> (d) [Subsidiary] shall pay to UCB the sum required to secure the full reconveyance of the Trust Deed, and shall secure such reconveyance and file same for recording concurrently with the recording of reconveyance of the Leases.

---

1. Shortly before closing, a California corporation was incorporated named "The Stinnett Oil Company," with 99 shares of stock issued to Stinnett and one share to Damson. At closing, Stinnett transferred all his shares to Damson and the Property was conveyed from Mobil to this corporation, which then became a subsidiary of Damson. By forming this corporation and calling it "The Stinnett Oil Company," the parties avoided waiting for City's further consent to an assignment of the lease to a new purchaser.

"The Stinnett Oil Company" is referred to as "Subsidiary" throughout the remainder of this opinion to avoid confusion with Stinnett the person or with the name under which he was doing business when he entered the original contract with Mobil on July 21, 1975.

In early February 1976, the FEA promulgated regulations not meeting the criteria specified by the parties. On February 11, 1976, Subsidiary gave written notice to Mobil of its election to rescind. However, Mobil did not want to repurchase the Property. It therefore entered into discussions with Subsidiary and Damson about modifying the transaction in view of the Property's reduced value. Mobil and Subsidiary amended the Repurchase Agreement, extending the time within which Subsidiary could exercise its rescission rights until April 1, 1976.

On March 25, 1976, Subsidiary again gave Mobil written notice of its election to rescind. On the same day, however, Subsidiary sent a separate letter to Mobil, offering to purchase the Property for $100,000 cash, and requiring that Mobil buy all crude oil produced from the Property. In the alternative, Subsidiary offered to purchase the Property and certain pipeline facilities owned by Mobil for the sum of $200,000. Except for the reduced price, Subsidiary proposed that other terms of sale remain as stated in the Basic and Repurchase Agreements dated December 31, 1975.

On April 9, 1976, Subsidiary and Mobil entered into a Price Reduction Agreement whereby:

1. In consideration of the waiver by [Subsidiary] of its right to rescind the purchase of the Property, the price for the Property shall be reduced to the following:

a. $100,000 cash, and the parties hereto agree to enter into an agreement for the sale by [Subsidiary] to Mobil of all crude oil produced from the leases on the same terms and conditions of that certain crude oil contract, Mobil Contract No. 1284, between the parties and dated December 31, 1975;

or, in the alternative:

b. $200,000 cash for the Property and the pipeline facilities, as hereinafter described...

On May 7, 1976, Mobil formally accepted the second alternative (sale of the Property and pipeline for $200,000).

In a letter to Stinnett dated May 20, 1976, Damson asserted that Subsidiary had exercised its right to rescind acquisition of the Property. At the same time, Damson informed Stinnett that Subsidiary had acquired the Property at a substantially reduced price, adding:

[I]t is still our intent to recognize your original contribution to the locating of this property. Although the terms of our original agreement with you are clearly no longer in force, we are prepared to reach agreement with you on an appropriate consideration recognizing the substantially reduced value of the property.

Stinnett, refusing to accept Damson's unilateral pronouncement that the terms of his original agreement were "no longer in force," demanded payment of the consideration set forth in the Basic Agreement of December 31, 1975. When Damson refused, Stinnett brought this suit for breach of that Agreement.

The action was tried without a jury on May 24, 25, and 26, 1978. On June 21, 1978, the court entered findings and conclusions, of which those relevant on this appeal are:

*Finding of Fact*

18. Plaintiff and defendant did not mutually intend or agree that plaintiff would receive the consideration set forth in the December 31st Agreement so long as [Subsidiary] ultimately acquired the property, regardless of the price paid for the property.

*Conclusions of Law*

2. Damson's failure to convey to plaintiff the consideration set forth in the December 31st Agreement did not constitute a breach of that Agreement because [Subsidiary] timely elected to rescind the acquisition of the property from Mobil, and [Subsidiary] and Damson exercised their right under Paragraph 1 of the December 31st Agreement to be relieved of the obligation to convey to plaintiff the consideration set forth in that contract.

3. Plaintiff was entitled to receive the consideration set forth in the December 31st Agreement only in the event that [Subsidiary] did not elect to rescind the

acquisition of the property under the conditions of the Repurchase Agreement. By its actions and through its agreements with Mobil during the period from March 25, 1976 through May 7, 1976, [Subsidiary] elected to rescind the acquisition of the property within the meaning of the December 31st Agreement. The Agreement entered into with Mobil for the acquisition of the leases, equipment and pipeline was a new agreement and not merely a modification of the previously existing agreement between Mobil and Company regarding the acquisition of the property.

4. [Subsidiary] rightfully and properly elected to rescind the acquisition of the property within the time period set forth in the Repurchase Agreement, as amended by Mobil and [Subsidiary], and a rescission was accomplished in substance.

9. Plaintiff is entitled to reasonable compensation for his efforts in arranging the sale of the property from Mobil to [Subsidiary], and, therefore, is entitled to judgment on the Sixth Count of his complaint in the sum of $10,404.96 against Damson.

### Issues

The issues on appeal are whether: (1) Subsidiary and Mobil rescinded the acquisition of the Property; (2) Subsidiary and Mobil entered into a novation; and (3) Stinnett was merely a "finder."

### OPINION

### Scope of Review

Suit was brought on the Basic Agreement and on the rights and obligations arising

therefrom. Interpretation of that agreement requires consideration of the circumstances surrounding its negotiation and execution, other agreements executed in relation to that transaction, and the conduct of the parties after execution of those multiple agreements. *See* Restatement (Second) of Contracts § 238 (1973).

Damson says the clearly erroneous standard is applicable, pointing to *Bauge v. Crown Life Insurance Co.*, 473 F.2d 787, 788 (9th Cir. 1972) and cases cited therein.

The standard and Fed.R.Civ.P. 52(a) apply to findings of fact, not to conclusions of law. Here there is no factual dispute on what the agreements say or on what the parties did. Dispute centers on the legal effect on Stinnett's rights of agreements entered by Subsidiary and Mobil, and on the intent of Stinnett and Damson when they executed the Basic Agreement. The district court labeled its rescission determination a conclusion and its intent determination a finding. Assuming without deciding that the standard applies to those determinations, whatever their label, we are, on the entire evidence, "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).[2]

■ Specifically, the determinations: (1) that Subsidiary rescinded acquisition of the Property; and (2) that the *parties* intended that Stinnett receive a different consideration if acquisition occurred at a different price, are clearly erroneous.[3] They are

---

**2.** With the flow of appeals at floodtide, the beneficial effect of Rule 52(a) is enhanced. Nonetheless, the raison d'etre of an appellate tier would be undermined were it incapable of correcting clear error. When the sea of litigation surfaces clear error below, reversal in adherence to Rule 52(a) does not diminish the tide-stemming function of the Rule.

**3.** It may have been Damson's intention, at some stage, that Stinnett would not receive the agreed consideration. As the record makes plain, that was never Stinnett's intention. Nor does any such intention of Damson correspond to what the Basic Agreement says or to any conduct of Stinnett before or after execution of

the Agreements. There is thus no evidence that the parties intended anything but what the Basic Agreement provides.

Damson says it is unreasonable for Stinnett to expect the agreed consideration when the price of the Property was changed from $1,000,000 to $200,000. It did not, however, present that concept to Stinnett until after it acquired the Property. Nor does it say whether Stinnett could have expected twice the agreed consideration if the price of the Property had been changed to $2,000,000. The Basic Agreement simply does not relate the consideration due Stinnett, in any manner, to the price paid for the Property.

clearly erroneous not because they are contrary to the weight of the evidence, but because they are wholly unsupported by evidence. *United States v. Johnson*, 327 U.S. 106, 111–12, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946); *Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439 (1933).

**(1)** *Subsidiary and Mobil did not rescind the acquisition of the Property.*

■ Rescission is the "[a]nnulling or abrogation or unmaking of [a] contract and the placing of the parties to it in status quo. It necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it." Black's Law Dictionary 1472 (revised 4th ed. 1968) (citations omitted).

Under the Basic Agreement dated December 31, 1975, Damson had only two options. If FEA did not promulgate regulations by March 1, 1976, or if regulations promulgated earlier did not meet specified criteria, Subsidiary could elect "as set forth in the Repurchase Agreement between Mobil and [Subsidiary], to rescind the acquisition of the Property," and Damson could walk away from the deal. In that event, it would be relieved of any obligation to pay Stinnett the agreed consideration of common stock, expenses, and royalty. On the other hand, if Subsidiary elected not to rescind the acquisition within the period stated in the Repurchase Agreement, Damson was obliged under the Basic Agreement to pay Stinnett the agreed consideration. Damson at no time prior to its acquisition of the Property attempted to negotiate with Stinnett any modification of its obligation to pay the agreed consideration.

As set forth in the Repurchase Agreement, Subsidiary could exercise its option to rescind the acquisition by giving written notice to Mobil,

and, thereupon the parties hereto covenant and agree to take the following actions on the tenth (10th) day next following receipt of the aforementioned notice:

(a) [Subsidiary] shall reassign the Leases and reconvey the Personal Property to Mobil in the same form as the conveyances of the Property from Mobil to [Subsidiary].

(b) Mobil shall return the Note to [Subsidiary], and no interest shall be due or payable on the principal thereof for any period during which Mobil held the Note.

(c) Mobil shall pay to [Subsidiary] the sum of $800,000 in full consideration for the reconveyance of the Property from [Subsidiary] to Mobil.

(d) [Subsidiary] shall pay to UCB the sum required to secure the full reconveyance of the Trust Deed, and shall secure such reconveyance and file same for recording concurrently with the recording of reconveyance of the Leases.

Those formal and specific acts of rescission were expressly set forth in the Repurchase Agreement and would have returned the parties to the status quo. They never happened.

That rescission never occurred is confirmed by other facts as well. Thus, under the Basic Agreement of December 31, 1975,

Upon completion of the repurchase of the Property by Mobil, as contemplated in the Repurchase Agreement ... Stinnett shall purchase from Damson, and Damson shall sell to Stinnett, all of the shares of common stock of [Subsidiary] for the sum of $100, which transfer by Damson shall be without representation or warranty of any kind or nature.

That stock transfer never occurred.

Moreover, Subsidiary's February 11 letter of rescission was nullified by the agreement to extend the time for rescission, and, although Subsidiary purportedly exercised a right to rescind the acquisition in a letter to Mobil of March 25, 1976, it simultaneously offered in its other letter of the same date

to acquire the Property, albeit at a reduced price. That Subsidiary did not rescind was recognized in the Subsidiary-Mobil Price Reduction Agreement of April 9, 1976: "In consideration of the *waiver by [Subsidiary] of its right to rescind* the purchase of the Property, the price for the Property shall be reduced to the following . . . ." (Emphasis added)

Manifestly, as events unfolded beginning in February, 1976, Subsidiary did not elect to rescind the acquisition of the Property; it elected to negotiate the acquisition at a reduced price. In this endeavor, it succeeded.[4] For when Mobil accepted Subsidiary's offer to buy the Property at a reduced price, there was created, not an agreement for the restoration of the status quo, but a modified executory agreement to convey and acquire the Property. *See Young v. New Pedrara Onyx Co.*, 48 Cal.App. 1, 192 P. 55 (Cal.App.1920).

(2) *Subsidiary and Mobil did not enter into a novation.*

■ Damson argues that the Price Reduction Agreement between Subsidiary and Mobil dated April 9, 1976, constituted a novation, effective to extinguish all rights and obligations under the Repurchase Agreement of December 31, 1975. It follows, says Damson, that it no longer owes Stinnett the consideration agreed upon in the Basic Agreement dated December 31, 1975. The argument lacks merit.

Calling the Price Reduction Agreement a "novation" is a self-serving mischaracterization of that agreement. Alteration of some details of a contract, while leaving undisturbed its general purpose (here, conveyance and acquisition of the Property), constitutes a mere modification of the original contract, and the latter remains in force as modified. *See Travelers Insurance Co. v. Workmen's Compensation Appeals Board*, 68 Cal.2d 7, 64 Cal.Rptr. 440, 434 P.2d 992 (1967). The $200,000 final price paid by Subsidiary to Mobil was part of the $800,000 cash paid to Mobil at the December 31, 1975 closing, that `$800,000 being the proceeds of a loan made to Subsidiary by UCB on the closing date. That loan was never discharged, but simply reduced from $800,000 to $200,000 by the expedient of Mobil returning $600,000 cash to UCB, a fact highly probative of the continuity between the December 31, 1975 acquisition of the Property by Subsidiary, and the Price Reduction Agreement of April 9, 1976.

Further, if there had been a "novation," it could not have affected the rights of Stinnett, who was not a party to the negotiations or agreements between Subsidiary and Mobil culminating in modification of the original transaction. *See* 66 C.J.S. *Novation* § 22 (1950); *Joseph Melnick Building & Loan Ass'n v. Melnick*, 361 Pa. 328, 64 A.2d 773 (1949). Stinnett bargained at arm's length for the consideration specified in the Basic Agreement of December 31, 1975. He had a right to rely upon Damson's promise to pay that consideration. It is fundamental that the purpose of every contract is to bind the parties to performance and to place the risk of performance upon the promisor. 17 C.J.S. *Contracts* § 1(2) (1963). Subsidiary, on the other hand, had no right to so maneuver with Mobil for a new deal as to freeze Stinnett out of his right to receive the agreed consideration, or to free its parent Damson of its obligation to pay that consideration.[5]

(3) *Stinnett was not merely a "finder".*

■ The record belies Damson's assertion that Stinnett was merely a "finder," enti-

---

4. It is at least incongruous for Damson, which did acquire the property, to argue that it rescinded "the acquisition." Nothing in the Basic Agreement speaks of rescinding a contract, the sole option provided therein being an option to rescind the acquisition of the Property. There is simply no evidence that Damson rescinded the *acquisition* of the Property.

5. The record does not reflect Damson's reasons for not approaching Stinnett to seek a change in the agreed consideration if it acquired the Property at a lower price, or whether it feared that Stinnett would, if so approached, insist on Damson's rescission of the acquisition and a resultant opportunity of Stinnett to purchase the Property at a lower price. The important fact is Damson's failure, whatever its reasons, to seek a change in the agreed consideration.

tled only to a "finder's fee" based on a percentage of the actual purchase price. Stinnett, an experienced oil and gas operator, personally entered into the original Acquisition Agreement with Mobil of July 21, 1975, obligating himself to pay $1,000,000 for the Property. Mobil accepted Stinnett as a principal, after checking his net worth through Dun & Bradstreet. From his own funds, Stinnett paid a $100,000 deposit against the purchase price, and personally arranged to borrow the $900,000 balance from UCB, which committed to finance the transaction before Damson ever appeared on the scene.

In addition, in the event the Damson/Mobil deal collapsed, because of adverse FEA regulations, Stinnett would not have simply forfeited a fee (conventionally, all a "finder" receives). He was obligated in that event to: (1) have Damson released from its guaranty of the $800,000 UCB bank loan; and (2) pay the interest on that loan from December 31, 1975, to the date on which it was discharged.

Nor is that all. Characterizing Stinnett as a "finder" ignores the Basic Agreement of December 31, 1975, under which the consideration flowing to Stinnett was in exchange not only for his arranging the sale from Mobil to Subsidiary, but also for "the sale of the stock of Stinnett in [Subsidiary] to Damson." Although Stinnett made that stock sale, he has not received the agreed consideration set forth in the Basic Agreement.

### Conclusion

Stinnett was not a "finder." He was a principal who had made the July 21, 1975, Acquisition Agreement with Mobil. Damson, seeking to stand in his shoes, agreed to pay him 12,500 shares of Damson stock, reimbursement of expenses, and an overriding royalty. Damson was protected by an escape clause whereby, if the FEA promulgated adverse price regulations, Damson could rescind the acquisition, that is, it could walk away from the deal. Damson did not, however, walk away. Nor did it pay the agreed consideration. Instead,

through Subsidiary, it negotiated with Mobil and did acquire the Property, albeit at a reduced price. Subsidiary and Mobil thus never rescinded the acquisition of the Property. Nothing of record evidences any intent on the part of Stinnett to accept less than the agreed consideration if Damson acquired the Property at a different price. In concluding that Damson's failure to pay the agreed consideration was not a breach of the Basic Agreement of December 31, 1975, the district court clearly erred. Its judgment must, therefore, be *reversed* and remanded for further proceedings consistent with this opinion.

*REVERSED.*

HUG, Circuit Judge, concurring:

I concur in the opinion of Judge Markey and add these comments.

Under the basic agreement of December 31, 1975, among Roy Stinnett, Damson, and Subsidiary, unless Subsidiary exercised its option "to rescind the acquisition of the property," Roy Stinnett was entitled to receive consideration in form of shares of Damson stock, a 5% royalty, and expense money. This option had been set forth in the Repurchase Agreement that had been executed the same day between Mobil and Subsidiary. The essential question is whether the action taken by Subsidiary amounted to an exercise of the option "to rescind the acquisition of the property".

I consider it highly probative that the agreement of April 9, 1976, between Subsidiary and Mobil provided that the consideration for the reduced price for the property was Subsidiary's waiver of its "right to rescind the purchase of the property". Subsidiary then proceeded to retain the property for a reduced price. It is difficult for me to discern how the actual retention of the property by Subsidiary, coupled with the express waiver of its "right to rescind the acquisition of the property", could possibly constitute an exercise of its option to "rescind the acquisition of the property".

The dissent argues that Subsidiary exercised its option to "rescind the acquisition of

the property" simply by giving notice, regardless of its later determination not to require Mobil to repurchase the property in accordance with that notice. Surely this would be a triumph of form over substance. The December 31 agreement did not discharge Damson's obligation to pay the consideration simply if a notice was sent to Mobil, but only if Subsidiary exercised its option "to rescind the acquisition of the property". The transaction with Mobil was not an executory contract that a notice could serve to rescind. It was the actual acquisition of property, and it would appear to me that the acquisition could be rescinded only by retransferring the property. Subsidiary had acquired the property; it retained the property; it did not require Mobil to repurchase the property; and thus, in my view, it did not "rescind the acquisition of the property".

A second factor is highly probative to me. Subsidiary was the entity that acquired the property under the December 31 agreement and was also the entity that retained the property after paying the reduced price. On December 18, 1975, Subsidiary was incorporated and the stock was issued, with 99 shares going to Roy Stinnett and one share to Damson. Concurrently with the transfer of the property to Subsidiary on December 31, Mr. Stinnett transferred all of his stock in Subsidiary to Damson. This device was used to avoid a delay of three and one-half months in obtaining a new consent to the assignment of a lease from the City of Los Angeles. The December 31 agreement among Roy Stinnett, Damson, and Subsidiary provided that if the option to rescind the acquisition of the property were exercised that "Damson shall sell to (Roy) Stinnett all of the shares of common stock of (Subsidiary) for the sum of $100". Damson did not sell or tender the stock to Roy Stinnett.

It is highly unlikely that Damson would have intended its negotiations to result in an obligation to do so. If we follow Damson's reasoning that the transaction was a

rescission, then there was a clear obligation to transfer the stock. Roy Stinnett would thus have been entitled to reacquire all of his 99 shares and Damson's one share in Subsidiary, which would then own the property purchased for $200,000 and would also owe the United California Bank $200,000 on the loan made to the corporation for the purchase.[1] The benefit of the bargain, which was negotiated by Damson with Mobil, would thus flow to Roy Stinnett through his ownership of all the stock in Subsidiary. It is difficult to believe that this would have been Damson's intent.

Under the terms of the December 31 agreement there is no way that Damson could have accomplished a rescission and still have used the Subsidiary to hold the property. The rescission would have been accomplished and the property purchased by Damson. To do so the Repurchase Agreement between Subsidiary and Mobil could have been fully executed, with repurchase by Mobil, and the transfer of stock in Subsidiary to Roy Stinnett by Damson, thus completely eliminating Subsidiary from the picture. This would have been a true exercise of the option to rescind the acquisition of the property. Damson, in its own name, then could have entered into a new agreement with Mobil to purchase the property. Damson chose not to do this, quite possibly because it would have required the consent of the City of Los Angeles and would have occasioned new arrangements with the United California Bank. The property thus remained in the Subsidiary.

Damson is faced with the strong argument that if it intended a true rescission, then it incurred the responsibility to transfer all of the stock in Subsidiary to Roy Stinnett and thus lose the benefit of its bargain. It is completely unreasonable to attribute this intent to Damson. Therefore, I conclude that there was no exercise of the option to "rescind the acquisition of the property".[2] Roy Stinnett is thus entitled to

---

1. The original loan of $800,000 was made by United California Bank to Subsidiary. Mobil paid $600,000 on the loan, leaving a balance of $200,000 due from Subsidiary to the bank.

2. The actions of the parties and the wording of the documents are not in dispute. There are conflicting signals in this circuit as to whether, under the circumstances, the interpretation of a

the consideration set forth in the December 31, 1975 agreement.

WALLACE, Circuit Judge, dissenting:

I respectfully dissent. I agree with the majority that what the contracts say and what the parties did are not in dispute. Yet, this is not a case that turns on questions of law, which are freely reviewable. This is not a case of contract interpretation in which the result depends solely on the application of legal principles to settled facts. *See Libby, McNeill and Libby v. City National Bank*, 592 F.2d 504, 512 (9th Cir. 1978). Rather, it depends on the characterization of the events surrounding the formation of the contracts, and what the parties intended to accomplish by their actions. Because I think these determinations necessarily dictate the legal consequences and are at the heart of this case, I agree with the position, apparently adopted by the majority, that our function on appeal is limited to determining whether the district court's interpretation was clearly erroneous. *Kittitas Reclamation District v. Sunnyside Valley Irrigation District*, 626 F.2d 95, 98 (9th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 861, 66 L.Ed.2d 802 (1981); *United States v. Ironworkers Local 86*, 443 F.2d 544, 549 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *Lundgren v. Freeman*, 307 F.2d 104, 113–15 (9th Cir. 1962). *Cf. Commissioner v. Duberstein*, 363 U.S. 278, 289–91, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960) (determination of whether a particular transaction is a gift under the Internal Revenue Code is a question of fact, and the trial judge's determination must stand unless clearly erroneous). The majority concludes, in part, that the district court's holding that rescission occurred was "wholly unsupported by evidence." I disagree and conclude that the

district court's interpretation is not clearly erroneous, and, therefore, I would affirm.

I

The district court concluded that Subsidiary timely elected to exercise its rights under the Repurchase Agreement. The evidence shows that Subsidiary gave notice of its election on February 11, 1976, after the FEA promulgated its regulations on or about February 1, 1976. On February 13, 1976, Mobil and Subsidiary agreed to put off the Repurchase Agreement deadline until April 1, 1976, pending a new set of FEA regulations due on March 1, 1976. On March 25, 1976, Subsidiary again contacted Mobil, indicating that it was exercising its rights under the Repurchase Agreement. Subsidiary also made two alternative offers to purchase the Property back from Mobil. On April 9, 1976, Mobil and Subsidiary entered into an agreement. That agreement recited that Subsidiary had exercised its option to require Mobil to repurchase the Property. It further stated that Mobil would reduce the price of the Property either to $100,000, or to $200,000 with Mobil also conveying pipeline facilities to Subsidiary. The consideration stated for this reduction in price was Subsidiary's "waiver . . . of its right to rescind the purchase of the Property." On May 7, 1976, Mobil accepted the second of the two alternatives.

I conclude that the interpretation of this April 9 agreement is the crux of this case. If the April 9 agreement merely modifies the December 31 sale and replaces the Repurchase Agreement, then Stinnett may recover under the Basic Agreement. If the April 9 agreement was a new contract for sale formed after the operation of the Repurchase Agreement, then Stinnett may not recover under the Basic Agreement. Because the April 9 agreement is contradictory on its face, however, it is difficult to

contract and the determination of the effect of the actions of the parties is a conclusion of law, which is freely reviewable by this court, or is a finding of fact subject to review under the clearly erroneous standard. *See Kittitas Reclamation v. Sunnyside Valley Irrigation District*, 626 F.2d 95 at 98 (9th Cir. 1980) (conclusion of law); *Libby, McNeill & Libby v. City National*

*Bank*, 592 F.2d 504, 512 (9th Cir. 1978) (conclusion of law); *United States v. Iron Workers Local 86*, 443 F.2d 544, 549 (9th Cir.) *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) (finding of fact); *Lundgren v. Freeman*, 307 F.2d 104, 113–15 (9th Cir. 1962) (finding of fact). In this case, under either standard, the judgment must be reversed.

interpret. It recites that Subsidiary exercised its right to rescind, then provides for Subsidiary's waiver of that very right.

The district court held that "rescission was accomplished in substance." That interpretation is not clearly erroneous. By giving notice to Mobil on March 25, Subsidiary exercised its option under the Repurchase Agreement. Under the terms of the Basic Agreement and the Repurchase Agreement, the contracting parties had certain rights and duties upon Subsidiary's notice. Thus, after March 25, Subsidiary had a present right to enforce the terms of the Repurchase Agreement. It is this present right to enforce that Subsidiary waived in the April 9 agreement, not the right to exercise its repurchase option. As things stood after the March 25 notice, the Repurchase Agreement required Mobil to repay $800,000 in cash and return the $200,000 note to Subsidiary, and required Subsidiary to reconvey the Property to Mobil and to secure the reconveyance of the trust deed from UCB. The Basic Agreement relieved Damson and Subsidiary of their obligations to pay Stinnett, required Stinnett to reimburse Subsidiary for any sum in excess of $800,000 expended in securing the trust deed from UCB, and required Damson to sell all the shares of Subsidiary stock to Stinnett for $100.

Subsidiary and Damson, however, wanted to keep the Property, but at a lower price in light of the new regulations. Mobil did not want to repurchase the Property. Subsidiary and Mobil could have gone through all the steps provided in the Repurchase Agreement, and begun negotiations anew freed from contractual restraints. If they had done this, the terms of the Basic Agreement would have extinguished Stinnett's rights. Instead, they chose to take the most direct route to reach their goal. Therefore, Subsidiary retained the Property, and Mobil conveyed to Subsidiary $600,000 in cash, the $200,000 note, and the pipeline facilities. Arguably, the form of this transaction is a mere reduction in price as established in the Basic Agreement. That argument, of course, is undercut by the addition of the pipeline facilities. Nevertheless, in substance it is a new purchase of the Property by Subsidiary after Mobil's repurchase. For if Subsidiary had not exercised its repurchase rights, Mobil would have had no reason to enter into the April 9 agreement. I cannot agree with the majority that the district court's holding that "rescission was accomplished in substance" was "wholly unsupported by evidence."

II

Both Stinnett and the majority rely on *Young v. New Pedrara Onyx Co.*, 48 Cal. App. 1, 192 P. 55 (1920), for the proposition that when a notice of rescission is accompanied by an alternative proposal, which is accepted, the original contract has not been rescinded, but has been modified. This reliance is misplaced.

In *Young*, Blochman conveyed all the stock of a Mexican company to a California company in exchange for all of the stock of the California company. The California company had an option to repurchase its own stock for $160,000. The California company was to sell its stock to the public, with the proceeds going to Blochman. *Id.* at 6–7, 192 P. at 57. When it appeared that the California company was not sending the proceeds to Blochman, Blochman attempted to rescind the contract. In his notice of rescission, Blochman made an alternative proposal, under which he would relinquish his claim to the stock sold by the California company, and transfer all the California company's stock back to it. In return, the California company would issue Blochman some of its stock, reconvey to him all the Mexican company's stock, and pay him $5,000 cash. The board of directors of the California company adopted a resolution accepting Blochman's alternative proposal and authorizing the officers of the company to effect the transfer. *Id.* at 7–9, 192 P. at 57–58. The plaintiffs, stockholders of the California company, sought to void this resolution and sought an accounting from Blochman for everything he received pursuant to the resolution. *Id.* at 22, 192 P. at 63–64.

The California court rejected the plaintiffs' prayer for an accounting because title to the property had never passed to Blochman. *Id.* at 22, 192 P. at 64. First, the

court held that Blochman's notice of rescission was probably ineffective because it misstated the terms of the contract. Thus, the notice purported to rescind a contract that had never existed. *Id.* at 22–23, 192 P. at 64. Second, the court, assuming there was a mutual agreement to rescind, held that the resolution itself was insufficient "to revest Blochman with title." *Id.* at 23, 192 P. at 64. Thus, the court was concerned with who had title to the property, not with whether the transaction was a rescission or a modification. The court stated that the resolution purported to create "more than a mere 'rescission,'" and that it did, in fact, create an executory agreement. *Id.* at 26, 192 P. at 65. The purpose of the court's discussion, however, was to show that the agreement was executory, not executed, and that, therefore, no title had passed. *Id.* at 27, 192 P. at 65.

The case before us presents no issue of title. It is totally irrelevant who had title to the Property after Subsidiary's March 25 notice. The issue before us is not whether a rescission of the contract of sale had occurred such that legal title to the Property had passed. From a strictly technical point of view, there is no attempt to undue a contract in this case. Rather, there is an attempt to invoke a contract: the Repurchase Agreement. The issue is whether Subsidiary, by giving notice, triggered the Repurchase Agreement. If it did, it then had a present right to require Mobil to repurchase the Property such that Subsidiary's subsequent purchase of the Property can be considered a new contract for sale, rather than a mere modification of the original sales contract. Thus, the *Young* analysis of whether a rescission had been effected and whether title had passed is inapplicable to this case.

## III

There is a troublesome aspect to the district judge's interpretation of the facts. His analysis rests on the premise that the Repurchase Agreement was triggered by Subsidiary's March 25 notice. Yet, Damson never complied with the requirement of the Basic Agreement that it sell all of Subsidiary's stock to Stinnett for $100. This prob-

lem can be disposed of in two ways. First, it has not been raised. Nowhere in the pleadings or briefs does Stinnett make the argument that the Repurchase Agreement was triggered and that he was therefore entitled to specific performance of the sale of stock term. Second, the contemplation of the parties in drafting that term was that Subsidiary would be a mere shell when the stock sale to Stinnett would take place. The parties could not have contemplated that Stinnett would obtain control of Subsidiary for $100 regardless whether Subsidiary had assets valued at $200,000 or had no assets at all.

The foregoing interpretation of the facts of this case is certainly not the only logical or correct one. A good argument could be, and has been, made for the opposite view. Our task, however, is not to interpret the facts anew, but rather to determine whether the district court's interpretation was clearly erroneous. I believe that the district court's interpretation is not clearly erroneous, and, therefore, I would affirm.